MATEER v. THE MISSOURI PACIFIC RAILWAY COMPANY, *Appellant.*

IN BANC.

1. **Personal Injury:** RECEIPT, FAILURE TO READ: RAILROAD. An employe of a railroad, who, having the opportunity and ability, neglects to read all of a receipt releasing the company from any and all claims, on account of and arising from injuries received by him while in the service of the company, and signs the same, will not afterwards be heard to say that he did not read it.

2. ————: ————: INSTRUCTION. An instruction in an action for the injuries is improper which permits the jury to disregard the release, if the company's claim agent obtained it "by any trick or artifice;" it should confine the jury to the fraud shown by the evidence.

3. ————: ————: ————. An instruction should not be given submitting to the jury the question of fraud in obtaining a release where there is no evidence to support it.

4. ————: COMPROMISE. The law favors the compromise and settlement of disputed claims.

5. ————: SPLITTING CAUSE OF ACTION. One who receives a personal injury cannot split his cause of action into several parts.

*Appeal from St. Louis County Circuit Court.*—HON. W. W. EDWARDS, Judge.

Mateer v. The Mo. Pac. Ry. Co.

REVERSED.

THIS action was commenced in the circuit court, city of St. Louis, at the October term, 1886, for personal injuries alleged to have been sustained by plaintiff on the twenty-fourth day of November, 1882, while engaged as brakesman in the performance of his duties upon a train of defendant on the Carondelet branch.

The petition is as follows: "Plaintiff states that the defendant, a corporation organized under the laws of Missouri, was on the twenty-fourth day of November, 1882, and had for a long time prior thereto, and has since, been the owner of and operating a railroad in the state of Missouri, and, for the purpose of so operating said railroad, has in use cars, locomotives and all necessary railroad equipments, and also was in the habit of, and did use, haul and interchange with other railroad companies cars belonging to said companies, and did also employ upon its system of railroad cars belonging to various transportation companies and individuals; that at the date of the grievance hereinafter mentioned it had in use and was hauling over its road a class of cars known as the American Refrigerator Transportation Company's cars.

"Plaintiff also states that on the date aforesaid he was, and for a long time prior thereto had been, in the employ of the defendant as a brakeman, and that as such brakeman it became and was his duty to brake and unbrake, couple and uncouple cars, open and close switches for the purpose of switching cars from one track to another, and do such other work as occasion required in handling cars; that in the performance of said duties it was necessary for him to pass along and over the cars of the train to which he was assigned, climb upon the tops of, and to descend from, the same to the ground.

"That, at the date aforesaid, defendant was, through its agents and servants, hauling and placing a train of

cars upon the tracks at a point in St. Louis county, state of Missouri, a short distance west of the southern part of the city of St. Louis, known as the west yard of the Missouri Pacific Railway Company, said yard being located about one mile west of what was formerly the city of Carondelet; that there was being hauled and placed in said yard of defendant, and forming part of said train, a car which was marked 'A. R. T. Co.,' signifying that it was one of the cars belonging to said American Refrigerator Transportation Company; that plaintiff was employed by defendant and was engaged in the duty of assisting to place and switch said train on the tracks of defendant at said west yard.

"That for the purpose of enabling brakemen and others, whose occupation may demand it, there is provided at the side of each car, and near the end of the same, what is known as a stirrup, and at the end of each car handholds, forming a ladder, by means of which said brakemen and others can climb to the top of said cars and descend therefrom; that the aforesaid 'A. R. T. Co.' car, which was being hauled and placed as aforesaid by defendant, was so provided with a stirrup and handholds.

"That at the date aforesaid this plaintiff was engaged in assisting to place and switch said train of cars; that he had assisted in the switching of a number of cars at said yard and started to take his place on the top of the cars of said train; that for the purpose of so doing he stepped upon the stirrup of said 'A. R. T. Co.' car and swung himself around to the end of said car to seize one of the handholds of the ladder, placed as aforesaid at the end of said car; that the handhold of said ladder which plaintiff seized was so defectively fastened to said car that it broke and gave way, and plaintiff was thereby thrown to the ground upon one of the rails of the track of the defendant, and, before this plaintiff was able to get away from the position in which he had been thrown, the cars of said train ran upon and over the foot of this

plaintiff, bruising and mangling and cutting the same to such an extent as to require its amputation; that by reason thereof plaintiff became sick and lame and sore, and suffered great pain and anguish, and became crippled for life.

"Plaintiff also says that defendant was negligent and careless in employing and using the aforesaid car, having thereon the defectively constructed and imperfect and insufficient ladder and handhold aforesaid; that plaintiff was not negligent or careless, but was exercising all the care and. caution possible under the circumstances to avoid the injury referred to, and did not know the defective condition of said car, and that it was owing to the negligence of defendant in using said car so defectively constructed that the aforesaid accident, which resulted in injuries to him, occurred; that defendant knew of the unsafe and defective condition of the ladder or handhold upon said car, or by the exercise of reasonable care should have known that said defect existed at the date of the happening of said accident; but, notwithstanding, in violation of its obligations to plaintiff, did use the aforesaid car with the consequence described.

"By reason of the premises, therefore, plaintiff asks judgment in the sum of $10,000 and costs."

To which the defendant railway company filed an answer, containing a general denial, a plea of contributory negligence, and a further plea of a release by plaintiff of all damages growing out of his alleged injuries, in consideration of the sum of $300 paid to him by defendant, which said answer is as follows: "Now comes defendant, and for answer to the petition in the above-entitled cause denies each and every allegation thereof.

"*Second.* And, for a second defense, defendant alleges that whatever injuries, if any, that plaintiff received on the twenty-fourth day of November, 1882, from the accident mentioned in said petition, were the

result of his own negligence and want of ordinary care directly contributing to cause the same.

"*Third.* And, for a third defense, defendant alleges that after the happening of the alleged injuries and grievances to plaintiff in said petition alleged to have been the result of the negligence of defendant, and before the institution of the suit, to-wit, on the ——day of———, defendant made a settlement of the injuries complained of in said petition with plaintiff, and said plaintiff executed and delivered to the defendant his writing of release therefor, embracing the identical injuries mentioned in said petition and sued for by said plaintiff herein, which said release is herewith filed. Defendant further says that said plaintiff received the sum of money above mentioned, in full payment of all injuries claimed to have been received by him at the time and under the circumstances stated in the petition, and made the above release therefor."

To the portion of said answer, setting up affirmative matter, plaintiff filed a reply, which is as follows: "Plaintiff comes, and for amended reply, filed by leave of court, to defendant's answer, denies that whatever injuries plaintiff received on the twenty-fourth day of November, 1882, from the accident mentioned in his petition, were the result of his negligence, and want of ordinary care directly contributed to cause the same.

"And, replying to the third defense set up by the defendant, plaintiff admits that he signed the instrument filed by defendant, purporting to be a receipt for $300, for, and on account of, injuries received by him in the manner described in plaintiff's petition; but plaintiff says his signature to said receipt was obtained through false and fraudulent representations and statements made to him by defendant's agents, as to the character of said receipt; that this plaintiff did not read said receipt, nor hear it read to him by any person; that he was induced to sign said receipt by said false representations and statements made by defendant's

agents as aforesaid, and by artifice, deception and fraud practiced upon him by defendant's agents, he (this plaintiff) at the time relying upon said false representations and statements made by defendant's agents and not being aware of the artifice, deception and fraud being practiced as aforesaid, in the manner aforesaid.

"Plaintiff also says, that defendant's agents knew said representations and statements were false and fraudulent when they made the same, and also knew that they were practicing artifice, deception and fraud upon this plaintiff; that this plaintiff did not know said representations and statements were false, and did not know of the artifice, deception and fraud being practiced upon him at the time he signed the said receipt; that said receipt, although it purports to be given for injuries received by this plaintiff, as therein stated, was not intended or designed to be, and never understood by plaintiff to be, a release of his claim against defendant for damages arising on account of his injuries received, as stated in his petition, but was designed and intended and understood by this defendant to be in payment of his claim for services against this defendant during the time plaintiff was incapable of doing work on account of said injury. And, therefore, plaintiff asks the court to declare said instrument null, and for judgment as heretofore prayed."

This case was afterwards, on application of plaintiff, taken by change of venue to the circuit court of St. Louis county, in which it was tried at the November term thereof, 1887. Plaintiff, to sustain the issues on his part, introduced Thomas Shea as a witness in his behalf. Defendant, thereupon, objected to the introduction of any testimony in the case upon the part of the plaintiff, upon the ground that no proceedings had been instituted to set aside the release pleaded by defendant, and no offer or tender to the defendant of the money paid thereunder by defendant to said

plaintiff, which objection was by the court overruled, to which action of the court defendant duly excepted.

Said witness Shea thereupon testified in substance as follows: That he lives in Carondelet, and is a locomotive engineer, and was operating a locomotive as such on the Kirkwood branch of the defendant railway company in the year 1882; that he remembers the injury that happened to plaintiff in said year, though he cannot state the exact date; that witness was engineer on the train upon which plaintiff Mateer was head brakeman; that the head brakeman's duty is to "open switches, help the engineer to get the train under control approaching stations, also down steep grades, and to assist in seeing that the cars are taken off and on along at the different stations;" that the train in question was made up at Kirkwood; that the cars composing the train probably came from west of Kirkwood, and some from St. Louis; the cars come from different roads over the Missouri Pacific; that, at the time of the accident, Mateer got off the train with the intention of opening the switch, but a man connected with a gang belonging to a construction train opened the switch, and Mateer, as he supposes, returned to get on the train; that, after pulling the train from the sidetrack and attaching the engine to the caboose, witness learned that Mateer had his foot hurt; that witness, at the time, was about to leave some cars at the point of the accident; that the sidetrack was on the south side of the main track; that he remembers the fact of the switching being done; that the train, in pulling in on the sidetrack at the time, was moving probably at the rate of three, or four, or five miles an hour; that the duty of the head brakeman was to open the switch, and let the witness "pull the train in on the sidetrack, after he had opened the switch, and ride on the end of the 'full train,' and go back and get the caboose;" that it was necessary for the head brakeman to get on the train while it was in motion, provided

it was not moving too rapidly ; the train was not moving at a rate of speed exceeding five miles an hour ; that he knows nothing about Mateer ; " did not see it ; " that the west pit was probably three quarters of a mile west of Carondelet, right opposite the river Des Peres ; that to the best of his belief there was an inspector there ; that there were always inspectors in St. Louis, at the Missouri Pacific yards ; that to the best of his information there was no inspector at Kirkwood ; that he cannot tell whether there were inspectors at Pacific ; that he knows there were inspectors there at one time, and he expects there were inspectors there, because it is a large city, a great many cars are handled there ; that some of the cars, which pass over the Carondelet branch, come from Pacific, and some from this side of Pacific ; that the cars came from the Missouri Pacific system ; that he knows nothing about the car " that Mateer ( plaintiff ) was hurt by ; " that he does not know where the car came from, but that it formed a part of the train ; that the business of the inspector is to examine the running gear of the car ; also the body of the car, and see that everything is all right.

On cross-examination witness testified that he didn't see the injury, and doesn't know where Mateer was when he was hurt ; that he first saw Mateer after he was hurt, on Main street, where they took him up in the caboose ; that the last he saw of Mateer before he was hurt, he was going, as witness supposes, to get on the train ; that he thinks there were inspectors at Pacific ; that he doesn't know whether the car came from St. Louis, or from west of Kirkwood ; that he simply, with his engine, furnished the Missouri Pacific railway with power between Carondelet and Kirkwood ; that cars ought to be inspected in all large places ; that a car starting from St. Louis west would not be inspected till it got to Pacific ; that he never saw the car in question so far as he knows.

On redirect examination, witness said that it would be possible for a car to get on the Missouri Pacific railway without having passed through St. Louis to Pacific; that the cars at the Carondelet yard would have to pass St. Louis at the same time.

Wm. J. Mateer, plaintiff, testified, in substance, as follows: That in 1882 he was working on the Carondelet branch of the Missouri Pacific railway as head brakeman; that the Carondelet branch is a branch of the Missouri Pacific railway running from Carondelet to Kirkwood, connecting with the main line at the latter place; that the cars at the time of the accident came west, and the cars from St. Louis, that were intended for Carondelet, were set out at Kirkwood, and were gathered up there and taken to Carondelet; that the date of his injury was the twenty-fourth of November, 1882; that on the morning of that day they started out and went to Kirkwood; took a train up there, and they got to Kirkwood; they gathered the train to take it to Carondelet; that they got the cars from off the different tracks; that the principal part of this train came from the west (of Kirkwood), and the cars were set out on the sidetrack; that when they got down to Carondelet with the train they "headed in" at the west end of the west yard; the train did not stop, and witness got off to go ahead to open the switch, and, when the train went past an extra gang of men there, one of these men opened the switch for witness; the witness got back on the train, and while getting back he put his foot on the stirrup and swung to the end of the car, when one of the ladders gave way and he fell; that the stirrup was just at the side of the car and the ladder at the end, and the stirrup is where you put your foot first and swing your body around between the two cars and work your way up to the top; that the car in question had a stirrup; that the first handhold was along the side of the car; that he was three or four rounds up from the bottom when his handhold gave way.

The manner of his injury is stated as follows by witness :

"*Q.* State how it [ the handhold ] gave way ?  *A.* Well, I felt myself go .down ; I could just see the eye-hole where the bolt goes in, as I was falling.

"*Q.* How did it give way ; did it give way entirely ? *A.* Just partly ; one end.

"*Q.* What position did it take when it gave way ? *A.* I fell.

"*Q.* I mean the handhold ?  *A.*  Well, it was pulled right down.

"*Q.* Which end of it pulled down ?  *A.*  I don't remember whether it was the south end or the north end.

"*Q.* Well, did either end ?  *A.*  One end ; yes, sir.

"*Q.* How was that fastened to the car ?  *A.* Well, it was bolted to the end of the car where it screws up, and there are bolts screwed into the end of the car.

"*Q.* Did you notice whether there was a screw there at the time ?  *A.*  No, sir ; I noticed I was falling ; *I could see the eyehole as I was falling, and I tried to catch myself.*

"*Q.* When you fell where did you light ?  *A.* I lit just this way ( indicating ). and tried to throw myself out and save myself, and the wheel caught this foot.

"*Q.* I would like to ask you if these [ steps or rounds ] are readily seen by a person alongside of the car ?  *A.*  No, sir ; they are at the end of the car ; you first step on the car and swing around, and you catch hold of the steps and you are reaching above you."

Witness continued in substance as follows :  That the train at the time was going at a speed of four or five miles an hour—probably a little faster ; that he landed down on the track ; this ( right ) foot dropped down on the south rail ; that it was necessary for him to get on the car to see where the train was going ; that

when he is on the train "he runs over the rear end of the cars to see that they are all going;" that his duty was to see that the cars are all right and to keep a look-out from the rear end of the train, and, if the train breaks in two, to signal the engineer to keep out of the way; that at the time he was going to the position in the train where he belonged; that (at the time of the accident) he fell down and threw his body out to save himself, and the wheel went over his right foot; that after the wheel went over his right foot he dragged himself back as well as he could and leaned up against a little rise in the bank, and began to get sick at the stomach and dizzy, and that the injury pained him somewhat, and as the rear end of the train passed him the hind brakeman happened to notice him, and they stopped the caboose and some men from the switch ran up, and that is the last he remembers of the accident; that he thinks they put him in the caboose, and that the engineer backed and took the caboose and took it up to Main street, where they got a wagon and took witness down to Dr. Houghton's office, and then took him to the hospital, where they take the employes of the Iron Mountain railway; that he was taken to the hospital in the afternoon, and some time during the afternoon his foot was amputated; that he went to the hospital on the twenty-fourth of November, and staid there till twentieth of February following, at which time he was discharged from the hospital; that while in the hospital for a month and a half he suffered a great deal of pain; that after that the pain was not so severe; that since it has affected his nerves, and, if *he works much, it makes him weak and weary;* that at times it pains him; that his ability to work is greatly affected by the injury; that he can only do light work; that he cannot do manual labor; that his limb was healed up when he was discharged.

That two or three weeks after his discharge from the hospital he went up to St. Louis "to get time for

the time he lost;" that he went to see Mr. Jones; that he (Jones) "had charge of paying the men for the time when they were laid up sick or got hurt;" that Mr. Jones, he supposes, is employed by the Missouri Pacific Railway Company; that he went up to St. Louis and did not see Mr. Jones, as he was not at home, and his clerk told witness that he would send plaintiff a postal card notifying him when Mr. Jones was at home, and he did send a postal card in a few days after to plaintiff, who went up and saw Mr. Jones, and that Mr. Jones spoke about only allowing witness $125 for his time; that he went there to get time for the time he lost while he was laid up; that at first Mr. Jones said that he was only willing to give him $125; that witness told him it would cost more than that to get an artificial foot, and that witness thought it was worth more than that; that he then told Mr. Jones that Mr. Batcher was speaking about plaintiff watching the yard down there (Carondelet), and that he wanted "something to do, some light work, if he could get around;" that Mr. Jones said Mr. Dickinson had charge of that, and witness went to see Mr. Dickinson; that he went to see Mr. Dickinson after he saw Jones; that he came back to Mr. Jones, and Jones first wanted to give him $125, and witness left to go up there and get the papers, and afterwards went to see Mr. Dickinson, and told Mr. Dickinson that he did not think $125 was enough, and Mr. Dickinson said. "what do you think you ought to have?" and that witness said that he thought it was worth at least $300 for the time he had lost. Mr. Dickinson said he did not think it was too much; that plaintiff then came back and told Mr. Jones that, and Jones "fussed around" awhile and finally wrote out some papers and said: "You had better hurry, for the office closes soon on Saturday," and he gave plaintiff a paper, put it into a envelope and told him to go to Seventh and Poplar streets; that he does not know what Mr. Jones put in the envelope; that he did not see the paper, and

it was not read to him; that Mr. Jones and his clerk prepared the paper; that the paper was inclosed in an envelope and given to witness, and he was told by Jones to go to the general offices of the Missouri Pacific Railway Company, and "he handed it in to them and they took it;" that there were two offices, he thinks, but he knows that, at the last place he handed it in, a paper was handed out to him, folded up with the lower part exposed, and witness wrote his name and $300 was given him; that only the lower part of the paper was exposed.

As to the place where witness got the money, he said that "he was at a little kind of a place in there, and there was a little place partitioned off, a glass, and kind of a counter, and a window to it, and there was a settee or chair back, and he handed this paper in there, and he told witness to sit down, and after that he signed it through this window;" that a man called witness, shoved the paper out and said, " Here is your money, you sign that receipt;" that he got the money; that this man did not read the paper to him; did not tell him the contents of it, and witness did not read it at any time before he got his money; he just read the receipt part of it, the lower part; that on the same day that he got the money, but before he got it, Mr. Jones told him to go to Seventh and Poplar streets and "get some papers that were there, and told him to ask Mr. Black, a gentleman that was there, and witness brought them back;" that this occurred when he went up to see Mr. Dickinson; that he gave these papers to Mr. Jones or his clerk; that he did not know what these papers referred to; that "they said they were a report sent in about the accident or something of that sort;" that when he went to see Mr. Dickinson, Mr. Dickinson gave him a letter to take to Mr. Jones; that Mr. Dickinson said he was willing that Mr. Batcher (the agent of the railway company at Carondelet) should give

witness employment, and said, "Take this letter down
and give it to Mr. Jones."

Witness said that, when he went to Mr. Jones, he
(Jones) said he was only willing to give witness $125
for his time; that witness said "that is pretty low;"
that Jones said that he spoke to Mr. Dickinson (and
Mr. Dickinson was Mr. Batcher's superior officer), and
said, "Go and see Dick, he is a good fellow," and wit-
ness went there and told Mr. Dickinson about this affair,
and told him that Jones was only willing to give $125,
and that witness did not think that it was enough for the
time he had lost and to get a new foot, and that Dick-
inson said, "What do you think you ought to have?"
and that witness said he thought he ought to have at
least $300 for the time lost, and an artificial foot; that
Dickinson gave him a letter to Mr. Jones, and said that,
if Batcher gave witness the place down there, he was
satisfied, and that witness should have it; that he took
the letter to Mr. Jones, and that after that Jones got
to writing up some papers, and told him to take them
down to Seventh and Poplar streets, and that witness
would get his money; that Jones did not say what the
contents of the letter were; that witness told Jones
that Mr. Dickinson said he thought that $300 was not
too much for his time and the getting of a foot; that
nothing was said about the length of time witness had
lost, which was about three and one-half months; that
some months he gets as much as $70, $65, $69 and $68;
that he was paid $50 a month, and that if they made
extra trips they were allowed extra pay; that, before he
went to get the money, nothing was said by Mr. Jones
about settling for personal injuries; that he supposed
the $300 was for his time, and for the cost of his artifi-
cial foot; that there was an inspector at the west yards;
that there was an inspector at Pacific two or three
months before the injury; that the duties of an inspec-
tor are to inspect the tracks, the boxes, the ladders, the
supports and the balance of the car; that if there is any

defect in a car, they put a private mark on it, and they throw cars out often if they are loaded on account of defects; that the car he was injured by was an American Refrigerator Transportation car; that such cars have a shield on them about three feet across; that he doesn't know whether the car came from the east or the west.

On cross-examination witness said that the accident happened in the forenoon of the twenty-fourth of November, 1882; that he was head brakeman on the train, which consisted of fifty cars, some empty and some loaded; that it was a pleasant, sunshiny day; that he does not remember that it had been raining, and that he does not think the ground was slippery; that the train was just coming into the west end of the west yard at Carondelet from Kirkwood; that he had been on top of the cars and got off to throw the switch; that the switch being thrown for him he waited for the train to come along to get on again; that he put his foot on the stirrup and caught hold of the sidehold and pulled himself up; that the stirrup is on the side of the car and the rung or ladder is on the end, and is a few inches from the end of the car; that the ladder is probably two feet wide; that he put his foot into the stirrup and reached his hand around and caught hold of a couple of the rungs to swing himself around, and one of the rungs pulled out and he fell; that when he fell he was by the end of the car; that while he was falling he looked up and saw the hole where the screw (fastening the rung) had been; that as he was falling he tried to throw himself out, but did not get far enough; *that after he got out he noticed the car passed him and saw the mark (shield) on the side of it;* that he does not remember at what particular time he saw the shield; he is not *sure whether he saw it when he fell back from the car or when he fell down;* that the shield was on the side of the car, near the center; though he does not remember exactly whether the shield was on the

center of the car or on the door; that after he had fallen, and after he had pulled his foot out, before the second car came, the wheel having passed over his foot, he looked up, but that he cannot tell the exact moment when he saw the letters on the car; that he was in the act of stepping in the rung when he fell; that he is not certain whether he was putting his foot into the stirrup when he was falling; that when he fell one of his feet was in the rung; that when he fell he was reaching on the fourth rung; that when he fell, or was falling, he saw the hole where the screw was drawn out, and that was the only time he saw the hole; that the car was going all the time; that he has no impression as to how far the car projected over the rail; that Mr. Waters, the conductor of his train, came to where he was lying; that Mr. Waters asked him what was the matter, and witness told him he was hurt; that he does not remember telling Waters that witness made an attempt to get on the car and his foot slipped and he fell; that it might have been nine or ten days after he left the hospital before he went to Mr. Jones' office; that he went to Mr. Jones' office to get pay for his lost time and to get some money to get a steel shoe; that he saw Dr. Outten before he went to see Mr. Jones, and told him he wanted to go and get something for his time and for his foot; that he didn't say anything to Dr. Outten about making a settlement with the railway company; that Dr. Outten sent a letter to Mr. Jones by witness; that he did not know what the letter contained; that he took the letter to the corner of Sixth and Locust streets, to the Equitable building, where his office is now; that he remembers that there was a boy in the office; he thinks it was Mr. Bruce; that, when he first went to see Mr. Jones, Mr. Jones was not at home; and after some days he got a postal from Mr. Jones, and he went up and found Mr. Jones there, and he believes there was somebody else in the office besides Jones; that when he went in he told Mr.

Jones he would like to have some money for the time he had lost and to get a foot; that he does not know of a single person that ever got paid for his time lost while he was hurt, of his own knowledge, but had been told so; that he told Mr. Jones he wanted to get a settlement for his time and a new foot; that witness told Jones he didn't think $125 was enough; that witness told Jones he wanted to go to work, and that Batcher had a place down there and would give it to witness as soon as he could go there, provided Dickinson would indorse it; and that he (witness) could go and see Dickinson, and that when witness was up there he could go to Seventh and Poplar streets and tell Mr. Brock, or somebody in the office, to give him those papers; that he went to see Mr. Dickinson, whose office was in the Union depot (and who was superintendent of terminal facilities) and asked him about the situation, and that Mr. Dickinson said that if Batcher was willing that witness should go to work he was willing; that Batcher said he was willing to pay witness $45 a month if Dickinson would indorse it; that he talked with Dickinson about a settlement of his claim for his, witness, time; that he was making a claim for the time he had lost while in the hospital; that he paid nothing for attention while in the hospital; that when he was working as brakeman he got $50 a month and extra; that the extra time some months would make his wages $65, and other months would make them $70 a month; that he was paid $50 a month for his regular time, and if he did any extra work he was paid extra for that; that he claimed for three and one-half months' lost time while he was in the hospital; that if the railroad company saw fit to pay him $300 for three and one-half months' lost time, while his regular wages only amounted to only $175 for that time, it was none of the witness' business if they saw fit to give him more; that Dickinson asked witness what he thought his lost time was worth; that witness told him he thought it was.

worth $300; that Mr. Dickinson told witness that he did not think $300 was too much for his lost time, and gave him a letter to take to Mr. Jones.

That Mr. Dickinson did not read the letter to him; that he supposed the letter was in regard to the situation (with Batcher); that witness wanted to go to work, and that he does not know whether the situation he wanted to get at Carondelet with Batcher had anything to do with the settlement of his lost time with Jones or not; that he did not tell Mr. Dickinson that he was willing to take $300 in settlement of his claim against the company; that nothing of that kind occurred between Mr. Dickinson and him; that after he gave the letter to Mr. Jones, Jones "read it and fussed around awhile and commenced writing; he didn't know what he was writing; he (Jones) didn't say whether he would do it or not; he finally made up some papers and had the clerk make out some, too, and he gave them to witness and told him to go to Seventh and Poplar;" that Jones never read the papers to him; never told witness what he was doing; told witness to take them to Seventh and Poplar and get his money for his time; that he told him the money he would get for his time was $300; that the papers were never read to him; that he didn't see anybody go with him to Seventh and Poplar streets; that he didn't meet this young man (Bruce) there at Seventh and Poplar; that the young man in Jones' office didn't read the papers to him in Jones' office, and didn't read them to him in the auditor's and treasurer's office at Seventh and Poplar streets; that the young man didn't ask him if he understood the papers; that he thinks he went to the auditor's office first; that he doesn't remember on what floor of the building the auditor's office was; that he doesn't remember in which office he was paid; that he handed the paper (release voucher) in there; that he doesn't remember whether he got the paper back or not from the auditor's office; that he doesn't remember

whether there were two offices or one at Seventh and
Poplar streets ; that when he was paid, they handed
"this paper (voucher) out through the place that is
partitioned off;" that he read that portion of it certi-
fying that the above was a true copy of the original
account, etc.; that he staid in the employment of
the defendant railway company for over three years
after he was paid the $300 ; that he worked there at
Carondelet, as watchman at $45 a month ; that the rea-
son he did not bring suit before was that, as long as
they gave him something to do, and he could get a liv-
ing, he was satisfied ; that as long as they treated him
right, and gave him a chance of getting a living, he
didn't care about bringing suit.

That he didn't see Mr. Jones on the same day after
he got his money ; that two or three years afterwards
( after he was discharged ) he went to see Mr. Jones ;
that he went to see Mr. Jones to see if he could not fix
the matter ( about his discharge ) up and go to work
again ; that he said to Mr. Jones that he had been dis-
charged down there ( Carondelet ) and wanted to be
reinstated, and wanted him to help witness to get
back ; that he did not say anything about witness
having given a release and having settled his claim
against the company ; that he also went to see Mr.
Dickinson and asked him to give him something to
do ; that he believes Mr. Jones had his matter inves-
tigated, and that Mr. Jones told him he had been
discharged because Mr. Leers, at Carondelet, had found
him asleep on duty ; that he did not say to Mr. Jones
that he supposed "it was all up with him," and that he
did not have any claim against the company, and that
they had his release ; that he carried Dr. Outten's let-
ter to Mr. Jones, and Mr. Dickinson also ; that he went
down to Mr. Brock's office and got the reports of his
accident and brought them up to Mr. Jones; that he
doesn't remember of Mr. Jones' reading the reports of
the accident to him ; that Mr. Jones, as he remembers,

did not read the report of what Mr. Waters said about the accident, nor what Dr. Outten said about how he was injured ; that no reports of any kind were ever read to witness ; that after he had been discharged and came back to see Mr. Jones about being reinstated Mr. Jones did not send and get a copy of the voucher and release and read them over to him ; that he never read the voucher and release before signing it, except the lower portion of it, which was a receipt for his money ; that when he got his money at the treasurer's office he did not see anybody and was not identified ; that he does not know whether a man can go down to the treasurer's office and get his money without them knowing who he is ; that he does not know whether this young man ( Bruce ) told them who he was or not ; that he does not know what the young man went down there for ; that it was none of his business whether they knew him or not when they paid him.

This was substantially all the testimony offered by plaintiff.   Defendant thereupon demurred to plaintiff's evidence, which was overruled by the court, to which action of the court defendant at the time excepted.

The two vouchers referred to in the pleadings and evidence are as follows :

" Form 812.

" Accounts payable.

" *The Missouri Pacific Railway Co. to Wm. J. Mateer, Dr.*

" State when furnished, at what station or subdivision, and for what particular purpose, the articles were used, service rendered or expenses incurred, attaching all invoices or papers relative.

" Address, St. Louis, Mo.

" Date voucher —— 188—.

" No. 6274.

"For personal injuries and time lost.

" 1883, March 10.   In full settlement and satisfaction of all claims against the Missouri Pacific Railway

Company, for personal injuries received while in employ of said company as brakeman, having my right foot crushed by car wheel running over it, caused by ladder giving way and letting me fall on the track, November 24, 1882, on the Carondelet branch of the Missouri Pacific railway. And I do hereby fully and forever release and discharge said company from any and all claims of whatever kind or character I may have, on account of or arising from said accident or injuries, in consideration of the sum of three hundred dollars ($300).

" All papers relating thereto herewith attached.

" Half of right foot cut off.

" Authorized, examined and found correct.

"WM. E. JONES,

"Claim Agent.

"Examined and approved.

"———, Superintendent, —— division.

" Approved.

"A. A. TALMAGE,

" General Manager, Hays."

"Form 813.            8-88—5 M. H. J.

"Accounts payable.

"*The Missouri Pacific Railway Co. to Wm. J. Mateer, Dr.*

"Address, ST. LOUIS, Mo.

"In full for personal injuries and time lost.

. "1883, March 10. In full settlement and satisfaction of all claims against the Missouri Pacific Railway Company for personal injuries received while in employ of said company as brakeman, having my right foot crushed by car wheel running over it, caused by ladder giving way and letting me fall on the track, November 24, 1882, on the Carondelet branch of the Missouri Pacific railway. And I do hereby fully and forever release and discharge said company from any and all claims of whatever, kind or character I may have on account of or arising from said accident or injuries, in

consideration of the sum of three hundred dollars ($300).

"Half of right foot cut off.

"Alterations by erasures must not be made in this voucher. If not accepted as made, it must be returned for correction.

"I certify that the above is a true copy of an original account rendered by Wm. E. Jones, claim agent, duly authorized and approved for payment by A. A. Talmage, General Transportation Manager; that the same has been examined by me and found correct; that it has been duly registered and filed in the auditor's office.

"C. G. WARNER,
"General Auditor.

"By W. L. M., Auditor of Disbursements.

"Received, March 10, 1883, of the Missouri Pacific Railway Company, three hundred dollars in full for the above account.

"$300.

"Witness here: WM. J. MATEER.

"Witness: H. W. G."

"NOTE.—The above receipt must be dated and signed by the party in whose favor this voucher is made, or, when signed by another party the authority for so doing must in all cases accompany it. All signatures 'by mark' must be witnessed by two persons.

"Return voucher to D. S. H. Smith, local treasurer, St. Louis, Missouri."

W. E. Jones, on part of defendant, testified he was claim agent; knows plaintiff; plaintiff came to his office about March 6, 1882, and asked him for his report; that he asked Mateer how he received his hurt, and Mateer said he was braking for Waters on Carondelet branch; that in trying to get on train his foot slipped off the oil box and got under the wheel. Witness read Mateer the reports and asked him if the statement was correct. Mateer said, "To be honest with you I don't know how I got hurt." Mateer said Dr. Outten thought

he ought to wear a steel shoe ; that Aloe would make him one for $25, and the company ought to get that and give him something besides. Witness finally offered him $125. Mateer said he knew Mr. Dickinson, the superintendent, and he thought he would do better; that Batcher was willing to give him a job watching at $35 a month ; that if he would make it $45 that would help him out. Witness then told him to go and see Mr. Dickinson.

Mateer brought a note from Dr. Outten to the witness, as follows :

"The Missouri Pacific Railway Company, Medical Department, St. Louis, Iron Mountain & Southern Railway,

"St. Louis, March 6, 1888.

"*W. E. Jones, Esq., General Claim Agent.*

"Dear Sir.—Please find inclosure. Mr. Mateer is desirous of settlement. I do not know what the present arrangements are about settlement; I have given him our local surgeon's report. Mr. Mateer was treated at this hospital; he is an old and tried employe of the Missouri Pacific. He, as you will see, is permanently injured. Yours respectfully,

"W. B. Outten, S. S."

When he returned from seeing Mr. Dickinson, he brought the following note to witness:

"Missouri Pacific Railway, St. Louis, Iron Mountain & Southern Railway, St. Louis Bridge Co., Union Depot. Office of Superintendent of Terminal Facilities.

"St. Louis, March 15, 1883.

"*W. E. Jones, Esq., Claim Agent.*

"Dear Sir.—I am perfectly willing Batcher should employ Mateer. He tells me he is willing to take $300 in settlement, which I think is reasonable. The fact that he has been so long in the employ of the company

shows that he has been more than an average man of his class.                    Respectfully yours,
"A. W. DICKINSON,
"Superintendent."

Witness says that upon this letter he made the voucher. Mateer read it, and insisted on the time (three and one-half months) being included in it; that Mateer fully understood the whole matter. To the same effect is the evidence of Mr. Dickinson, the superintendent, and Warren Bruce, the voucher clerk. The latter testified that, after he drew the voucher, he read it to Mateer. After Mr. Talmage had approved it, Mr. Jones attached all the papers to it and gave them to Mateer, and sent witnesses to the treasurer's office to identify him. He says at the auditor's office a copy of the voucher was made; at the local treasurer's office, witness read it over to Mateer; identified him; he signed it and got his money. The voucher was not folded so as to hide any portion of it.

The court then, at the instance of the plaintiff, gave to the jury the following instructions: "If you find, from the evidence in this case, that the plaintiff, on or about November 24, 1882, was in defendant's employ as a brakeman on its railroad; that, whilst in such employ, and in the discharge of his duties as such brakeman, he attempted to climb up the end of one of the cars attached to the train on which he was serving as brakeman, and that the ladder, or one of the rounds or handholds of the same, gave away, by reason of its being in a defective and dangerous condition for the usage for which it was intended, and that, by reason of its giving away, plaintiff fell and sustained the injuries of which he now complains; and, if you find the defendant did know, or, in the exercise of ordinary care on its part, might have known, of the defective and dangerous condition of said ladder, or handhold, on said car, prior to the accident, and that plaintiff was ignorant of the defect, and was exercising ordinary care at the time he was hurt, then

plaintiff is entitled to recover, and you should find in his favor, unless you believe that the release read in evidence is a bar to this action, as to which you are hereinafter instructed in instructions 7, 8 and 9.

"2.   Although the jury may believe, from the evidence, that the car in question, from which the plaintiff fell, was a foreign car,—that is, a car belonging to some other company, or person, or railroad company,—and that it had been received by defendant from such other company, for purposes of transportation, and that, when so received, the handhold thereon was defective, yet, if the jury believe that such defect in the car was known to the defendant, at and prior to the accident, or that, by the exercise of ordinary care and diligence, it might have been known and repaired, the defendant is not excused by the fact that it was a foreign car, and was in a defective condition when received.   Nor is the defendant excused by the fact that it had no actual knowledge of any defect in the car in question, if, by the exercise of ordinary care and diligence, it might have known of such defect prior to the accident.

"3.   If the jury find for the plaintiff, they will assess his damages at any sum, not exceeding the amount stated in plaintiff's petition, which the testimony warrants, and, in determining the amount of such findings, the jury are at liberty to take into consideration all the injuries sustained by the plaintiff caused by the accident, with the personal pain and suffering and consequences resulting therefrom, whether temporary or permanent, bearing in mind that it is compensation, to be fixed by them, for the damage to plaintiff on account of the negligence of the defendant; but the jury will not include, in estimating the plaintiff's damage, anything for loss of time for which, they find from the evidence, he has already been compensated by the payment of the $300 in question heretofore paid him by the defendant.

"7.  If the jurors believe from the evidence that
plaintiff and defendant's claim agent merely agreed
upon the amount that should be paid plaintiff as com-
pensation for time that plaintiff had lost in consequence
of his injuries, and that no agreement was made or
intended to be made by plaintiff to relinquish for the
sum of $300 all of his claims or demands against the
defendant growing out of the injuries in question,
and if you find from the evidence that the defendant's
claim agent, knowing that plaintiff did not intend to
release all his claims on account of personal injuries,
nevertheless caused the paper read in evidence, termed
a release, to be drawn up in its present form, and that
said claim agent, or any other agent of the defendant
by any trick or artifice procured or induced the plaintiff
to sign said release, he being at the time ignorant of its
contents and ignorant of the fact that it was a release of
all his claims on account of personal injuries sustained,
then the court instructs you that said release does not
preclude a recovery in this action, but it simply pre-
vents you, in the event you find in plaintiff's favor,
from making him any further allowance by way of
damages on account of lost time."

"11.  The court instructs the jury that by the
phrase 'preponderance of evidence' they are not to
understand that the number of witnesses who may
testify to any fact, affirmatively or negatively, will con-
stitute a preponderance of evidence.   But, in ascertain-
ing the preponderance of evidence as to any fact, they
are to look to all the circumstances surrounding the
transaction as shown by the evidence, consider the
credibility of the witnesses, their bias or prejudice,
their relationship to the parties, and all other things
which tend to increase or diminish the value of their
testimony."

To the giving of which said instructions to the jury,
and each of them, the defendant objected ; which said
objection of defendant to said instructions, and each of

them, the court overruled, to which action and ruling of the court the defendant then and there duly excepted at the time.

The court then at the request of defendant gave to the jury the following instructions: "4. Defendant asks the court to instruct the jury, that if they believe from the evidence that plaintiff, while employed as a brakeman on the train of the defendant, in the west yard of said defendant at Carondelet, attempted to get upon a car of said train while in motion and slipped and fell upon the track of the railway in front of a moving car and was injured, he cannot recover in this case.

"5. The burden of proving the alleged negligence of defendant in failing to provide a safe ladder upon the car, upon which plaintiff was attempting to get, and of showing that any defect therein, if they find from the evidence there was any defect, was known to the defendant or ought to have been known to it, by the exercise of ordinary care, at the time of the accident to the plaintiff, is upon the plaintiff.

"6. The mere fact that the injury complained of resulted to plaintiff from a defect in the handhold of the ladder is not of itself sufficient to entitle him to recover, but the burden is upon the plaintiff to show defendant had notice of the defect, if defect there was, or that by the exercise of proper care it might have known of it, and also to show that the accident happened from or by reason of the defect complained of in the petition."

"8. The court instructs you that the paper read in evidence signed by the plaintiff and termed a release is on its face a release of the cause of action sued upon in this case. The legal presumption is that plaintiff understood the contents of said paper when he signed it, and the burden is upon the plaintiff to show to your reasonable satisfaction and by a preponderance of evidence that he was not acquainted with the contents of

said paper, and that he did not agree to release all his claims for damages growing out of his injuries, for the sum of $300, and, unless he has affirmatively so proven to your reasonable satisfaction by a preponderance of evidence, you ought to find for the defendant.

"9.   If you find from the evidence that the paper termed a release was read to the plaintiff at or before the time he signed it, or that plaintiff himself read the same, then the law conclusively presumes that he understood the effect of the document, and that he agreed to release all his claims for $300, and you should find for the defendant."

The jury thereupon returned a verdict for plaintiff, and assessed his damages at the sum of $3,000.

*H. S. Priest* for appellant.

(1)   The demurrers to the evidence should have been sustained:   *First.*   Because there was no proof of culpable fault such as to fix a liability.   *Bowen v. Railroad,* 95 Mo. 268; *Gutridge v. Railroad,* 94 Mo. 471; *Huffman v. Railroad,* 78 Mo. 54; Wood, Master & Servant, sec. 419; Shear. & Red. on Neg., sec. 99; *Cahill v. Hilton,* 106 N. Y. 513; *Railroad v. Hughes,* 119 Pa. St. 301.   *Second.*   Because there was no impeachment by the evidence of the release.   *Hinkle v. Railroad,* 18 N. W. Rep. 275; *Rose v. Railroad,* 12 Atl. Rep. 78; *Wallace v. Railroad,* 25 N. W. Rep. 772; *Railroad v. Shay,* 82 Pa. St. 198; *Brown v. Fagan,* 71 Mo. 563. *Third.*   Because conceding the facts as stated in the reply, they do not constitute a legal reason for the overthrow of the release.   *Fourth.*   They do not in equity.   *Fifth.*   Because the release could not legally or equitably be set aside according to the prayer of the reply, until a return of the money received by plaintiff had been made, or a tender of it.   *Benton v. Stewart,* 3 Wend. 236; *Bain v. Wilson,* 1 J. J. Marsh, 202; *Jarrett v. Morton,* 44 Mo. 275; *Hurt v.*

*Handlin*, 43 Mo. 171; *Estes v. Reynolds*, 75 Mo. 563; Kerr on Fraud & Mistake, 366, *et seq.* ( 2 ) Under the pleadings the judgment should have been for the defendant. ( 3 ) The reply raised only equitable issues, which could not be tried in an action of law. It sought an annulment of the contract upon the ground of fraud and mistake. ( 4 ) Plaintiff's seventh instruction is erroneous: *First.* It ignores the issues raised by the reply, which seeks an annulment of the whole settlement. It affirms in part the settlement so far as wages, and rejects the remainder, which is in effect a reformation of the contract. This cannot be done in a law action. *Second.* The words " trick or artifice " are not sufficiently defined—not defined at all—and the jury were left to form their own opinion as to what would constitute fraud. *Third.* It ignores the undisputed fact that the settlement was made by Mr. Dickinson and only carried out by Jones, and as to that settlement there is not a single assault by the evidence. ( 5 ) The verdict is against the vast preponderance of the evidence, so much so as to indicate passion or prejudice on the part of the jury, and should be set aside.

*B. Pike* also for appellant.

( 1 ) The objection of defendant to the introduction of any testimony in the case upon the ground that the release pleaded by defendant had not been set aside, and that no tender back of the money paid thereunder by defendant—to the defendant had been made, should have been sustained, and it was error on the part of the court below to receive any testimony in behalf of plaintiff. *Blair v. Railroad*, 89 Mo. 392, 395; 1 Story's Eq. Jur. [ Redf. Ed. ] sec. 138; *Mastin v. Grimes*, 88 Mo. 490; *Snyder v. Spaulding*, 57 Ill. 480; *Sanborn v. Batchelder*, 51 N. H. 437; *Guckenheimer v. Angevine*, 81 N. Y. 396; *Garrett v. Morton*, 44 Mo. 275. ( 2 ) The

demurrer to the whole evidence should have been sustained upon the grounds that the testimony wholly failed to show any defect in the handhold, or that (if the handhold was defective) the defendant had notice of such defect, or could have discovered the same by the exercise of ordinary care. *Second.* That the testimony showed beyond question that plaintiff signed and executed the release pleaded by defendant with knowledge, actual or implied, of its contents, and received the amount of money specified therein as the consideration therefor, and still holds the same even after his pretended discovery of its alleged fraudulent character. *Third.* That the release is valid (until judicially set aside), even upon the assumption that plaintiff's testimony is true that he believed, when signing the same, that the money paid by the railway company was only for his so-called "lost time." On first ground see: *Elliot v. Railroad*, 67 Mo. 272; *Covey v. Railroad*, 86 Mo. 635; *Gibson v. Railroad*, 46 Mo. 166; *Dale v. Railroad*, 63 Mo. 453; *Devitt v. Railroad*, 50 Mo. 305; *Seila v. Railroad*, 82 Mo. 430; *McDermott v. Railroad*, 30 Mo. 116; *Gutridge v. Railroad*, 94 Mo. 471; *Railroad v. Huntley*, 38 Mich. 537. On second ground, see cases cited under first point, and *Estes v. Reynolds*, 75 Mo. 565; *Garrett v. Morton*, 44 Mo. 275; 43 Mo. 171, and cases cited therein. On third ground see *Burnett v. Crandall*, 73 Mo. 22. (3) The court committed error in giving the instructions asked by plaintiff. *Gutridge v. Railroad*, 94 Mo. 471; *Railroad v. Huntley*, 38 Mich. 537.

*I. C. Terry, Rowell & Ferris* and *J. H. Zumbalen* for respondent.

(1) The defect in the handhold was negligence, and the defendant was liable if it had knowledge thereof, or could have discerned it by the exercise of

ordinary care.    *Condon v. Railroad*, 78 Mo. 567; *Gutridge v. Railroad*, 94 Mo. 468; *Brann v. Railroad*, 53 Iowa, 595; *Goodman v. Railroad*, 81 Va. 576. ( 2 ) The evidence as to fraud in the alleged release was sufficient to sustain the verdict.    *Vautrain v. Railroad*, 8 Mo. App. 538; s. c., 78 Mo. 44; *Railroad v. Lewis*, 13 Ill. App. 166; s. c., 109 Ill. 120; *Sobieski v. Railroad*, 41 Minn. 169; *Conner v. Chem. Works*, 17 Atl. Rep. ( N. J.) 975; *Bank v. Crandall*, 87 Mo. 208. ( 3 ) There was no occasion to set aside a receipt obtained by fraud or to return the amount received.    *Vautrain v. Railroad*, 8 Mo. App. 538; s. c., 78 Mo. 44; *Mullen v. Railroad*, 127 Mass. 86; *Railroad v. Lewis*, 13 Ill. App. 166; s. c., 109 Ill. 120; *O'Neil v. Iron Co.*, 63 Mich. 690; *Railroad v. Doyle*, 18 Kan. 58; *Wright v. McPike*, 70 Mo. 175; *Cole v. Wiedmair*, 19 Mo. App. 12; Bishop, Contracts [ 1 Ed.] secs. 190, 191, 194, 197, 198. ( 4 ) The question is not raised by objection to the introduction of any evidence.

GANTT, P. J.—The statement of plaintiff's evidence is made unusually full, on account of the conclusions we have reached, and to the end that our rulings may be clearly understood.

By reference to the pleadings, it will be seen that the plaintiff sues for injuries received on the twenty-fourth of November, 1882. The defendant, in its answer, pleads a general denial, contributory negligence, and a full settlement and release of damages, on the tenth of March, 1883.

Plaintiff, in his reply, admits the execution of the release, and the receipt of the $300 mentioned in it; but seeks to avoid its effect by charging that the release was obtained by false and fraudulent representations made to him by defendant's agents. Says he did not read the release, or hear it read, before he signed it; that it was obtained by artifice, deception and fraud practiced upon him by defendant's agents, and he asks the court to declare the instrument null.

The defendant urges many objections to the action of the trial court, but, as in our opinion, the demurrer to the evidence interposed at the close of plaintiff's case should have been sustained, we shall confine this discussion to an examination of the plaintiff's evidence, offered in support of his reply, and the giving of the seventh instruction, as prayed by the plaintiff.

The reply admitted the execution of the release and the receipt of the $300 stipulated for, and sought by a general allegation of fraud, without stating any traversable fact constituting the fraud, to avoid the release. There is no allegation of any mental or bodily infirmity which rendered it possible for defendant's agents to overreach plaintiff. He was not illiterate. He read so much of the release as he cared to read. The usual *indicia* of unfair and fraudulent settlements are wholly wanting on the face of the pleadings. But, as the court submitted the case to the jury, and gave certain instructions, we will examine the evidence to determine the propriety of giving these instructions, and the submitting of the case to the jury.

Vague, indefinite and general as the charge of fraud is in the reply, it is still more baseless in the evidence offered to support it. The evidence discloses that the plaintiff was a man forty-two years old; that he could read and write; that he had been employed for a number of years by the defendant; that he had his foot crushed while serving as brakeman, on November 24, 1882. After remaining in the company's hospital for disabled employes some two or three months, we find him about the first of March, 1883, seeking an interview with Mr. Jones, the claim agent of defendant, and demanding a settlement. There is no pretense that at this time he was in any degree ignorant of the injuries he had received. His foot had been amputated, and he knew then as well as when he commenced his action that he was permanently injured. He sought Jones. It does not appear that any agent or servant of

the company ever made any effort to get a settlement with him. His own evidence shows that his claim for damages was exceedingly doubtful.

After Jones had read the report of the accident in which he lost his foot, he made plaintiff an offer of $125. Plaintiff claimed this "was pretty low." Said he knew Mr. A. W. Dickinson, the superintendent. It appears that Jones made no effort to induce him to accept the $125, but, on the contrary, advised him to go and see Dickinson. He accordingly saw Dickinson, and Dickinson said to him, "What do you think you ought to have?" To which plaintiff replied, he ought to have $300 for the time lost, and for an artificial foot. Thereupon, Dickinson agreed that Batcher, who superintended defendant's yards at Carondelet, should employ plaintiff as a watchman, at $45 per month, and authorized Jones to give him $300 in settlement. Plaintiff carried the letter to Jones, authorizing this settlement. Jones then had his clerk make out the voucher for the $300, and gave it to plaintiff, to go to Poplar street and get his money. Plaintiff took these papers to defendant's officers on Poplar and Seventh street. When he arrived there, according to his own statement, the clerk, or official who paid him the money, was in a room with a window in it. Through this window he handed plaintiff the voucher to sign. Plaintiff was in a room all to himself, and had this voucher in his own hands. He could read. No one connected with the company had made any statement to him of what it contained. He was told to sign it. It was his duty to read it before signing it, and he will not now be heard to say that he did not, when every opportunity was afforded him to do so. To permit such a rule would unsettle the business affairs of this country. *Glenn v. Statler*, 42 Iowa, 107; *Snider v. Express Co.* 63 Mo. 376; *Wallace v. Railroad*, 25 N. W. Rep. 772; *Railroad v. Shay*, 82 Pa. St. 198; *Greenfield's Est.*, 2 Harris, 486.

He says he read the lower part only. *The portion he signed referred to the account above.* That account was on the same half sheet of paper he was signing, and recited that this $300 was in full settlement of his claim against the defendant, for personal injuries received by a car wheel running over his foot, November 24, 1882. He now says the voucher was *folded* so he could not see the upper portion. There was no one in the room to *prevent* his *unfolding it.* But how utterly incredible is the suggestion, that this auditor's or treasurer's clerk should have had any reason for concealing any portion of that voucher! He had not seen Mr. Jones nor Mr. Dickinson. Plaintiff had been intrusted with the vouchers himself. Why should the clerk conceal the matter from plaintiff? How did this clerk know that Jones or Dickinson was concocting a scheme to swindle plaintiff? Plaintiff received $300, and a position as watchman at $45 per month. This he kept for four years, and only lost it because "*he slept on his post of duty.*"

The evidence contains not one scintilla of fraud on the part of Jones, Dickinson or the defendant. There is not in it, from beginning to end, one word that justified the trial court in submitting the issue of fraud to a jury. There is nothing in it tending in the remotest degree to impeach the absolute fairness of Jones, the claim agent, or Dickinson, the superintendent. There is nothing on which to base the seventh instruction. It was error to submit the question to the jury at all, and greater error to give the seventh instruction. That instruction, besides having no evidence to support it, was clearly erroneous in permitting the jury to disregard the release, if defendant's claim agent procured it by "*any trick or artifice.*"

This instruction well illustrates the vicious pleading which had stated no substantive fact upon which to hinge the charge of fraud. Of course, as no fraud was specified, when the court came to instruct, it could not,

as required by all correct practice, confine plaintiff *to the tricks or artifices charged in the petition,* but "the jury were given a roving commission" to scent out and find some artifice or trick, whether in the case or not. Such a practice cannot be tolerated.

Finally, instead of the conduct of Jones or Dickinson being subject to criticism for fraud or unfairness, it is due them to say this charge is wholly unfounded, and their conduct was characterized by fairness and kindness to plaintiff throughout. The court should have sustained the demurrer to the evidence. *Wallace v. Railroad,* 25 N. W. Rep. 772; *Penn. Ry. Co. v. Shay,* 82 Penn. St. 198; *Hinkle v. Railroad,* 31 Minn. 434; *Brown v. Fagan,* 71 Mo. 563; *Snider v. Express Co.,* 63 Mo. 376; *Grace v. Adams,* 100 Mass. 507; *Belger v. Dinsmore,* 51 N. Y. 166.

A settlement deliberately sought, as this was by the plaintiff, in which the defendant acquiesced in the very terms plaintiff himself dictated; a settlement recognized for four years by plaintiff and its benefits lost *then* only by his own misconduct, ought not to be set aside in the courts save upon the most satisfactory evidence.

The law favors the compromise and settlement of disputed claims. "It is to the interest of the commonwealth that there should be an end to litigation." If these settlements fairly made and entered into are to be disturbed upon frivolous grounds it will often deter these companies from doing justice to their employes who have received injuries, for fear of future litigation. A wise policy would dictate that they be encouraged to do justice in these cases outside of the courts, and that their settlements should be sustained when they are just and fair.

In this case plaintiff attempts to bring himself within the rule in the *Vautrain case,* 78 Mo. 44, by "claiming payment *for services* during the time he was *incapable* of doing any work on account of his injury."

Plaintiff had no right to wages as such that he could not earn. If he had been injured by the negligence of defendant he had a cause of action for damages and as an element of that damage he could show the special damage of loss of wages during the time he was disabled; but when he claimed for that time alone and for money enough to buy the artificial foot, knowing the full extent of his injuries at the time, he is presumed to have intended thereby to accept this amount in full satisfaction. *His cause of action was one and entire.* He cannot partition it and sue in separate actions for the different elements that enter into that damage from time to time as it may please his fancy. *Hinkle v. Railroad*, 31 Minn. 434.

For these reasons, the judgment of the circuit court is reversed. All concur.