Argued 11 December, 1900; decided 21 January, 1901.

**KING v. HOLBROOK.**

[63 Pac. 651.]

Reformation of Instruments* — Mutual Mistake.

A writtetn agreement respecting a sale of realty cannot be reformed by the grantor for mistake, where the grantee states that it correctly embodied the contract, and truly represented what he required as a condition precedent to the purchase, and the grantor's mistake arose from his failure to discover the plain letter of the agreement, which was not ambiguous: *Mitchell* v. *Holman*, 30 Or. 280, applied.

From Multnomah: John B. Cleland, Judge.

Bill for reformation of a written instrument by A. N. King against C. A. Holbrook, resulting in a decree for defendant, from which plaintiff appeals.　　　Affirmed.

For appellants there was an oral argument by *Messrs. Benton Killen* and *Chas. A. Coggswell.*

For respondent there was an oral argument by *Messrs. Geo. H. Durham* and *Thos. O'Day.*

Mr. Justice Wolverton delivered the opinion.

Plaintiff seeks to reform an agreement entered into between himself and the defendant, June 23, 1898, which contains a stipulation that it shall be treated as a part of a deed of the same date from him to the defendant. The complaint proceeds upon the theory that there has been a mutual mistake as respects one of the conditions of the agreement, which requires that North Twenty-First Street shall be opened to travel along the east line of the granted premises, it being alleged that it was the true understanding and agreement of the parties that the land lying east of the tract con-

---

*Note.—See monographic note, Reformation of Contracts, 65 Am. St. Rep. at pp. 481-522.—Reporter.

veyed should remain open only from the north side thereof to a point 108 feet from West Salmon Street, and that, when said street shall be extended by the city authorities over the tract so agreed to be used as a way, it should be without expense to the defendant. Holbrook purchased the tract of land referred to for T. B. Wilcox, which is bounded on the south by West Salmon Street, and on the east by North Twenty-First Street, of the City of Portland, if extended southerly to an intersection with said West Salmon Street. The principal factors in the negotiations leading to the purchase were I. W. Baird, acting for the defendant, and E. A. King, a son of the plaintiff, acting for him. Among the details of the transaction was an understanding that the defendant should remove from the premises a stock barn, and the plaintiff a house which stood partly upon the premises and partly within North Twenty-First Street, if extended, and the matter of opening up said street, in part, at least, so as to give access to the property, was discussed. A writing was drawn up and executed by the parties, they signing by their respective agents, and it is upon this writing that the alleged mutual mistake is predicated. It recites that "whereas, Amos N. King and wife have this day sold and conveyed to C. A. Holbrook a certain tract of land in the City of Portland, Oregon, at the corner of King and Salmon streets, and particularly described in our deed therefor, to which reference is made: Now, in consideration of the premises, it is mutually understood and agreed by and between the said parties that the said grantee shall, with all convenient dispatch, remove from the said granted premises the old stock barn now standing thereon, to the end that the said King may dismiss his suit against the City of Portland relating to said barn with safety to himself; that the said King shall, with like convenient dispatch, remove from said premises, and the lot adjoining the same immediately on the east, the old dwelling house occupied by a family named

Smith as a residence; and that North Twenty-First Street shall be opened to travel so far as the same bounds the granted premises on the east, so that the grantee in said deed may have access to that side of the granted lands, and that, when such street is extended and dedicated, it shall be done without charge to the said grantee above named. This instrument shall not be recorded, but, as between the parties, shall be treated as part of the said deed."

The testimony is conflicting, the principal witnesses being the factors or agents of the respective parties who conducted the negotiations in the main. Mr. E. A. King testified, in effect, that he was agent for his father for the sale, disposition, and management of the property; that he dealt with Baird, and knew no one else in the transaction; that the negotiations were in progress a month or such matter; that all the talk was that the 108 feet northerly from Salmon Street should be a lot, and that the street in front of the property should be opened up to that point, and no further; that after they had come to an understanding a survey was made; that during the negotiations he gave Mr. Baird a map, which shows, by a white line across North Twenty-First Street, if extended 108 feet northerly from West Salmon Street, that the space thereby set off was intended to be a lot, not to be opened as a part of the street, and Baird so understood it; that during the negotiations they went upon the lot, and he was shown around it to within a few feet of the corner; that the locality was discussed as being a sightly one for Holbrook to build upon, and there was never any direct talk of extending the street over the lot; that a stock barn stood upon the land deeded to Holbrook, and a house partly upon it and partly upon the lot in dispute; that the west half of the lot belongs to his father, and the east half to himself and brother; that they came to an agreement a day or so before June 23, and the terms as finally concluded were that King was to sell to Holbrook the property as designated upon

the map, Holbrook to remove the barn and King the house, and the street was to be opened to within 108 feet of West Salmon Street, the consideration being $15,000; that subsequently Baird presentetd to him the written instrument, which he examined, and refused to sign; that witness then showed it to Judge Moreland, who told him it would do no harm to sign it, and that he had it in his possession a very shore time prior thereto; that, after the agreement was executed and the transaction closed, Baird wanted an option to sell the lot in dispute, stating that he thought he could dispose of it to Holbrook, and, after some discussion, witness gave him a verbal option of thirty days to sell it for $4,000, he to make his commission above that figure; that he afterwards came into the office, said he was working upon a sale, and thought he would make it go. The area of the lot is 60 by 108 feet. Witness further stated that he never agreed to open up the street to West Salmon Street, and never would have signed the paper if he had known or understood that it was so stipulated; that during the negotiations Baird wanted half the street clear to Salmon Street included in the deed, but the witness would not accede to it.

On cross-examination he testified that he was to pay Baird a commission on the sale; that he insisted all the time that he would not open the street any further than to within 108 feet of West Salmon Street, and Baird was insisting that it should be opened through; that he wanted a deed to half the street, as he termed it, and witness would not accede to that proposition; that Baird presented the written agreement to him after the trade was consummated, and thinks, but is not sure, it was after all the money had been paid; that it was not handed to him the day before the deed was finally passed over to Baird; that he refused to sign it, because he did not think it needed any written agreement for the purpose of removing the barn and house and the fencing off the street; that, when he referred it to Judge Moreland, he (Moreland)

did not understand the catch about the street, and misunderstood witness' explanation, and, when it was subsequently discussed, he told witness the agreement held him to open up the street through to Salmon Street. Witness was then interrogated, and answered as follows: "Q. Isn't it a fact that you signed this, and then after you signed it Mr. Baird turned over to you the drafts and certificates of deposit for this land, and you gave him the deed? That is the fact, isn't it? A. I won't be absolutely sure about that. No, sir; it was all done about the same time, as I recollect it. Q. Who was present when you signed that instrument (Exhibit B)? A. Mr. Baird was there, my father, my brother N. A. King, and I think Judge Moreland, he was in the office; I don't know whether he was in our office or not, but he was close there."

N. A. King, the brother, testified, in substance, that the final verbal agreement between Baird and his brother was as stated by the latter; that the written agreement was signed after the money had been paid for the land; that the money was paid and the deed delivered in the morning, and the agreement was signed about lunch time, or early in the afternoon; that after it was discovered there was an error in the instrument, and the matter had been called to the attention of Mr. Baird, he wanted a deed to one-half the lot; that at the point where North Twenty-First Street, if extended, would intersect West Salmon Street, there is a cut of seven or eight feet on the east side, and four or five on the west, in the grade, and that teams cannot now pass up North Twenty-First Street.

Judge Moreland testified, in substance, that E. A. King brought the paper into his office, and asked whether he should sign it, and he replied, "This paper will not hurt you to sign; they are to remove the barn, and you are to remove the house"; that his attention was not especially called to the condition as it respects the street; that, according to his rec-

ollection, Mr. King said nothing to him about the street at the time; that the signing occurred in the afternoon, just after he came into the office from his lunch, and that the trade had been made, the deed delivered, and the money paid; that in a few days afterwards he heard King give Baird a thirty-day verbal option to sell the lot for $4,000, clear of his commission.

I. W. Baird testified, in behalf of the defendant, that the trade was pending about five weeks; that he wanted a deed to half the lot on the street, or what was called Twenty-First Street, to which they objected; that he then wanted them to open up Twenty-First Street, and they objected to that, saying it would put the whole into lots and blocks, and would make their taxes much heavier, and the trade about fell through; that he talked of an option on the lot, for which he had a customer, tried to sell that, but they wanted such an awful price for it that he could not make a sale, and he let it drop; that subsequently King came back, and wanted to know if the man was alive yet, and, being informed that he was, he gave witness four or five hours to close up the deal; that it kept going along for a couple of weeks more, and witness finally presented a written proposition to King, which he read to his father, and his brother read it, then it was presented to Judge Moreland, who told King to sign it, which he did; that thereupon witness paid $1,000, and, after the deed was delivered, he paid $14,000 more, less his commission; that Mr. George H. Durham drew the instrument at his request, which he submitted to T. B. Wilcox before submitting it to King; that he obtained the thousand dollars from Durham, and Wilcox furnished it to him; that he presented the agreement right after lunch one day, and they kept it until after lunch the next day; that when it was signed King and his wife came down in the afternoon, and it was then he paid the balance of the money and obtained the deed; that he paid no part of the money before the agreement was

signed, because he had no authority to do so; that he never came to any definite agreement with King until the paper was actually signed; that he agreed to put his statement in writing, and the one presented contained his final proposition; that the paper was drawn and submitted to Wilcox, and then to King, and they signed it the next day; that there was no mistake at all upon his part, and that he first received instructions from Mr. Durham regarding the purchase, and afterwards from Wilcox. On cross-examination, he testified that he obtained the thousand dollars first, then got the paper signed, showed it to Wilcox and Durham, when Durham gave him the balance of the money, which he delivered over to King, and procured the deed.

T. B. Wilcox testified that he recollected about the time negotiations commenced for the purchase between Holbrook and King, and that he was the real purchaser of the property and furnished the money for the purpose, and thought he saw the paper before it was signed; that there had been quite an extended negotiation regarding different features of the property after they came to the matter of price, and that he positively refused to buy unless Twenty-First Street was extended through to Salmon Street; that the instrument (Exhibit B) correctly states the agreement as he understood it; that the paper or a copy was furnished him before any money was paid, and that it represents what the witness required as a condition to the purchase.

From this summary of the testimony, it will appear that the verbal agreement, as understood by E. A. King, is sufficiently explicit in its terms to enable the court to reform it, if it was assented to by Baird in behalf of Holbrook, and a mistake was made in reducing it to writing. No fraud is averred, and the simple inquiry is—First, what was the true agreement? And, second, is there couched in the terms of the written agreement a mutual mistake in manner and substance as alleged? The chief actors in the negotiations differ

radically as their testimony relates to both of these questions. Mr. King asserts that a complete verbal understanding and agreement was arrived at between him and Baird, which was that Twenty-First Street should be opened up to within 108 feet of West Salmon Street, and no further, but that there was a mistake made in reducing the same to writing: while Baird declares that no agreement or understanding was entered into until the paper was signed by the parties; that the negotiations had been proceeding without definite results until he presented the paper as his final offer, and that the acceptance thereof, evidenced by his signing it, was the consummation of the agreement; that none other existed prior thereto; and that it contained the true and. final agreement of the parties. Notwithstanding Baird's positive declaration, it is urged that he is not stating the matter .truly, and that he was in reality mistaken when he had the agreement reduced to writing, as it respects the opening of the extension of North Twenty-First Street. Several reasons are assigned for this position, among which are the well-substantiated facts that only the west half of the lot in dispute was owned by .A. N. King, while the east half belonged to his sons; that Baird subsequently took an option to sell the lot, and that the grade at the point is a difficult one to overcome for street purposes; that these, connected with the circumstance that he is positively contradicted by three witnesses touching the time of the execution of the agreement, considered with relation to the time when the deed was signed and the money paid, so discredit his testimony as to render it wholly unreliable. E. A. King is corroborated by his brother touching the specific terms of the verbal agreement, and that it was arrived at before the writing was presented and signed, and was not truly incorporated in the writing. Standing alone, Mr. Baird's testimony could not be considered faultless, and there are some contradictions and inconsistencies, when carefully read, that add weight to the criticism, but .

the fact conclusively appears that Baird was acting for Mr. Wilcox in making the purchase; that Wilcox probably saw the written agreement before it was signed,—at any rate, that he saw it before he paid over the money; and he testified that it correctly embodies the terms of his proposition, and the only one upon which he would consent to make the purchase, or, in other words, that it truly represents what he required as a condition of the purchase. Mr. Wilcox's veracity is not questioned, and it is hardly possible to say that he was mistaken in the face of his positive declaration to the contrary. It may be conceded that King was mistaken touching the terms of the writing, and did not fully understand its contents when he signed it, but no such mistake is established as it relates to Baird or Wilcox, and unless there has been a mutual mistake, the plaintiff cannot prevail. It is not very material whether the agreement was signed before the deed was executed and delivered and the money paid, or afterwards. One of its undisputed specifications is that it shall be treated as a part of the deed, and all the negotiations, as completed, must be considered as an entirety.

There is an element of negligence coupled with the affair, attributable to King, the agent, in failing to discover the plain letter of the agreement, which is in no measure ambiguous or misleading, and in failing to inform his attorney, whose advice he sought, as to his real understanding touching the opening of North Twenty-First Street. He had ample opportunity to, and did, examine the writing, and there is little excuse, if any, for overlooking the exact statement as contained therein. But the alleged mutuality of the mistake does not satisfactorily appear, and there can be no relief on that account alone. "It is not enough, in cases of this kind," says Mr. Chief Justice SPENCER, "to show the sense and intention of one of the parties to the contract. It must be shown, incontrovertibly, that the sense and intention of the other party concurred in it. In other words, it

must be proved that they both understood the contract, as it is alleged it ought to have been, and as in fact it was, but for the mistake.   It would be the height of injustice to alter a contract, on the ground of mistake, where the mistake arises from misconception by one of the parties, in consequence of his imperfect explanation of his intentions.   To make a contract, it is requisite that the minds of the contracting parties agree on the act to be done.   If one party agrees to a contract under particular modifications, and the other party agrees to it under different modifications, it is evident there is no contract between them.   If it be clearly shown that the intention of one of the parties is mistaken and misrepresented by the written contract, that cannot avail, unless it further be shown that the other party agreed to it in the same way, and that the intention of both of them was, by mistake, misrepresented by the written contract": *Lyman* v. *United Ins. Co.,* 17 Johns. 372.   And such is the settled law as uniformly announced by this court: *Lewis* v. *Lewis,* 5 Or. 169; *Stephens* v. *Murton,* 6 Or. 193; *Hyland* v. *Hyland,* 19 Or. 51 (23 Pac. 811) ; *Meier* v. *Kelly,* 20 Or. 86 (25 Pac. 73) ; *Epstein* v. *State Ins. Co.,* 21 Or. 179 (27 Pac. 1045) *; Kleinsorge* v. *Rohse,* 25 Or. 51 (34 Pac. 874) ; *Mitchell* v. *Holman,* 30 Or. 280 (47 Pac. 616).   The decree of the court below will be affirmed, and it is so ordered.   AFFIRMED.