MARY McNAMARA *vs.* BOSTON ELEVATED RAILWAY COMPANY.

Suffolk.   November 19, 1907. — February 27, 1908.

Present: KNOWLTON, C. J., HAMMOND, LORING, BRALEY, & RUGG, JJ.

*Release.   Fraud.*

A release in writing of a cause of action is not invalidated, in the absence of fraud on the part of the person procuring it, merely by the facts that the party signing it did not read it and did not understand its contents.

A mere concealment of the contents of a release of a cause of action on the part of the person benefiting by the terms of the release, even if there be an attempt to defraud, is not in itself enough to avoid the release.   The true rule is that, where the person to whom the release is given undertakes to state its contents and conceals a material part of them, a fraudulent misrepresentation which invalidates the release is made out.

At the trial of an action of tort against a street railway company to recover for personal injuries alleged to have been received by the plaintiff, a woman, while a passenger upon a car of the defendant, the defendant relied in defence upon a release under seal.   The plaintiff admitted that she signed the release but contended that when she did so she did not have legal competency to act, and that she was induced to sign by fraud on the part of the defendant's agent.   There was evidence tending to show that, after the accident, the plaintiff was "in a very weak, hurt condition," that she travelled to within a short distance of her home by other street cars, making two transfers on the journey, and walked the remainder of the distance unattended, that then she went upstairs and lay down for a time when, in answer to a summons by the door bell, she came down stairs, "almost collapsed because of the effort," rested a moment and then opened the door, and admitted the agent of the defendant.   Her account of her interview with the agent was intelligent and, among other things, it appeared that the interview lasted from four o'clock to fifteen minutes after four, that the agent either told her that he had been to the houses of other passengers and "all the ladies had signed," or that he had been to all the houses "and they

signed," that the agent urged her to sign and that she, at first saying that she could not tell whether she was going to "sue the road" or not until she had seen her doctor, and protesting that she physically was unable to sign, finally did sign the release, and that, thereafter, in response to a question by him, she told the agent that the physician whom she was going to see was her family physician, that the agent thereupon handed her $5 and, she asking "What is this for?", he stated "That will pay the doctor." There was further testimony that, after the agent left, the plaintiff was "in a very weak condition," and, within an hour "was hysterical" in conversation with her husband and "unable to give a clear story of the accident," but that, within another hour she told the story of the accident to her physician. The plaintiff testified that she could not remember whether the agent read the release over to her or explained it to her. There was no evidence that the agent's statement as to the other passengers having "signed the paper" was false. *Held*, that there was no evidence from which a jury would be warranted in finding either that the signature of the plaintiff to the release was procured by fraud or that, when she signed, she did not have legal competency to act; and that therefore the release was a bar to the action.

TORT for personal injuries alleged to have been received by the plaintiff while a passenger on an electric street car of the defendant. Writ in the Superior Court for the county of Suffolk dated August 17, 1905.

The answer of the defendant alleged that the plaintiff's cause of action had been released by her " by an instrument in writing over her hand and seal."

At the trial, which was before *Dana*, J., the plaintiff's evidence tended to show that a fuse burned out upon the car upon which she was near the corner of Washington and Cobden Streets in the Roxbury district of Boston and that, in the rush of the passengers to get out of the car, she was injured; that she left the car and reached the sidewalk "in a very weak, hurt condition" and walked to a nearby post, by which she was supported until she took another car to the Dudley Street transfer station, transferred there to the elevated train to Dover Street, again transferred there to a South Boston car, that her friends accompanied her to C Street, South Boston, but that she went the rest of the way to her home at 702 East Fifth Street alone. Her testimony as to what occurred after she arrived at her home and until the defendant's agent came is stated in the opinion.

As to her interview with the agent of the defendant, she testified: " Well, I opened the door and the gentleman walked in and he said to me, ' Are you Mrs. McNamara,' and I said, ' Yes,

sir,' and he said, ' You were on the car the accident happened,' and I said, ' Yes, sir,' and I can't remember what he was saying ; all I remember of his saying was, ' Have you got any bones or limbs broken,' and I said, ' No,' and he said, ' Well,' he said, ' Are you going to sue the road when you have no bones or limbs broken ? ' and I said, ' Well, I can't tell what I will do until I see the doctor,' I said, ' I can't explain my, — the way I feel to you.' And he said he had been to the other houses and they all signed the paper, and handed me over the paper, and he said, ' You sign your name there,' and he said, ' Let me see,' he said, ' Has that paper got Margaret Riley signed in it ? ' and I returned him the paper, and he handed it back again, and I said, ' Well, now, you see my condition, I can't sign my name,' and he said, taking the paper from me, and putting it on a stiff envelope, ' Let me support it for you.' ' Well,' I said, ' It is impossible,' I said, ' I feel so sick,' and I remember of writing my name the best I could. . . . He asked me what doctor I was going to have and I told him my family physician. He put his hand in his pocket and took out a $5 bill and gave it to me, and I said, ' What is this for ? ' he said, ' That will pay the doctor.' " The testimony then proceeded : " Q. Now, did he say anything about that paper ; did he say anything about that paper being a release of all your claims against the Boston Elevated Railroad ? A. I can't remember of him saying anything. — Q. Now, did you read that paper ? A. No ; I don't remember of reading it. — Q. Did he read it to you ? A. I don't remember. — Q. Did he give you any explanation about it at all ? A. I don't remember."

At the close of the evidence a verdict was directed for the defendant on the ground that the release which was in evidence barred the action ; and the plaintiff excepted. Other facts are stated in the opinion.

*J. A. McGeough*, (*W. J. Sullivan* with him,) for the plaintiff.

*R. G. Dodge*, (*A. Kendall* with him,) for the defendant.

LORING, J. We are of opinion that the presiding judge was right in ruling that there was no evidence warranting a finding that the release given by the plaintiff was not binding on her.

It is settled on the one hand that it is no defence to a release that the person signing it neither read it nor understood its contents. *Leddy* v. *Barney*, 139 Mass. 394, 396. *Rosenberg* v. *Doe*,

146 Mass. 191, 193. This is but an application of the broad principle applied in a similar connection in *Grace* v. *Adams*, 100 Mass. 505.

On the other hand it is also settled that a release can be avoided if there was a fraudulent misrepresentation as to its contents, and if the party signing it without reading it did so, relying on that misrepresentation. *Bliss* v. *New York Central & Hudson River Railroad*, 160 Mass. 447. *Peaslee* v. *Peaslee*, 147 Mass. 171.

Further, there can be no question of his right to avoid it if he signed it when he did not have "legal competency to act," as it was put by Parker, C. J., in *Farnam* v. *Brooks*, 9 Pick. 212, 220.

The plaintiff's evidence here did not go far enough to warrant the jury in finding that the release signed by her was obtained by fraud, or that it was signed by her when she was in such a condition that she did not understand what she was doing ; or, as Chief Justice Parker put it, when she did not have "legal competency to act."

A mere concealment of the contents of a release, even if there be an intent to defraud, is not *per se* enough to avoid it. The statement in *McNicholas* v. *Prudential Ins. Co.* 191 Mass. 304, 309, relied on by the plaintiff in this connection, does not lay down the true rule. *McNicholas* v. *Prudential Ins. Co.* was not a decision on the point now under consideration. In that case a receipt not under seal was given by the plaintiff for the money received by her. It is not necessary now to consider further the statement there made. The true rule is laid down in *Freedley* v. *French*, 154 Mass. 339, namely, that where the person to whom the release is given undertakes to state the contents of it and conceals a part of them, a fraudulent misrepresentation is made out.

1. So far as the representation goes that the defendant's agent had been to the other houses and all the ladies had signed the paper, or that he went to all the houses and they signed (it was put both ways in the testimony), there was no evidence that this was not the fact. Four of the plaintiff's fellow passengers who were put on the witness stand by her testified that they had signed a release. So far as appears, therefore, this statement was true. The statement did not mean that all the other women

signed the identical piece of paper signed by the plaintiff.  If all of them had signed a release the truth of this statement was made out.

2. The plaintiff did not testify that the defendant undertook to state the contents of the release.  She did not testify that the $5 given her was paid to her to pay her doctor and so bring the case within *Bliss* v. *New York Central & Hudson River Railroad*, 160 Mass. 447.  What the plaintiff testified to was that the defendant's agent said that the $5 given her " will pay for the doctor" not that the $5 was given her to pay the doctor.

3. Lastly, the evidence did not warrant a finding that when she signed the release the plaintiff did not know what she was about, or, as Chief Justice Parker put it, that she did not have " legal competency to act."

The accident happened " five or ten minutes after the car left Forest Hills going toward Boston."  Beyond this the time of the accident was not testified to.  After the accident, with the help of friends, she boarded another car which took her " near her home in South Boston."  How far that was from her home does not appear.  She apparently walked home without assistance.  According to her testimony " she got upstairs the best she could and took her clothes off, and lay on the lounge until bell rung."  How long a time elapsed from the time she lay down until the bell rang did not appear.  The plaintiff's testimony is that about five minutes after she heard the bell ring, " I tried my way down the stairs, and when I got down I almost collapsed.  I rested for a moment and then I went and opened the door."  The defendant's agent was at the door.  The plaintiff in her testimony gave an intelligent account of what then took place.  She testified that after the defendant's agent left " she was then in a very weak condition."  But her testimony went no farther.  It was about fifteen minutes after four when the agent came to the house.

The plaintiff's husband came home " somewhere around five o'clock."  He testified " that he found his wife lying on the lounge, appearing very sick and weak and looking as if she had had a shock; that she was hysterical and not able to give a clear story of the accident; that she was in bed, very sick, for nine

days." But on cross-examination he testified "that his wife told him that night what had happened; that the doctor came between five and six o'clock, and she told him about being on the car and how she got hurt, describing how the thing happened; that she told the doctor what she complained of."

The only testimony which it could be argued went far enough is that of the plaintiff's husband that when he came home "somewhere around five o'clock" his wife "was hysterical and not able to give a clear story of the accident." What was in issue was whether she understood what she was doing when she took $5 and gave a release at about fifteen minutes after four. On the stand she gave an intelligent account of that transaction; her husband testified that between five and six she "told the doctor" how she got hurt, "describing how the thing happened." She did not testify that she did not understand the transaction; the farthest that her testimony went was that after the agent left she was "in a very weak condition." As we have said, the evidence did not, in our opinion, go far enough to warrant a finding that she did not have "legal competency to act" when she signed the release.

*Exceptions overruled.*