Argued March 15, reversed and decree rendered April 2, 1918.

## MANLEY *v.* SMITH.

(171 Pac. 897.)

**Reformation of Instruments—Evidence—Sufficiency.**

1. In suit to foreclose mortgage, where one defendant and mortgagor sought reformation for mistake in the mortgage rendering him liable for deficiency, evidence *held* insufficient to warrant reformation.

**Reformation of Instruments—Burden of Proof.**

2. In suit to foreclose mortgage, a mortgagor, who sought reformation to release him from liability for deficiency according to alleged agreement, had the burden to establish his contention by a preponderance of the evidence.

**Reformation of Instruments—Presumptions.**

3. In suit to foreclose mortgage, where defendant sought reformation for mistake, assuming that plaintiff and defendant were of equal credibility, plaintiff was entitled to benefit of presumption, as stated in Section 799, subdivision 19, L. O. L., that the transaction was fair and regular.

**Reformation of Instruments—Negligence.**

4. Where mortgagee accepted new mortgage and extended time, at reduced interest, a mortgagor, who had the mortgage prepared, but failed to read it, could not have reformation to express the alleged agreement that he should not be liable for a deficiency.

[As to rescission or cancellation of instrument for negligent mistake of one party, see note in Ann. Cas. 1913A, 432.]

Reformation of Instruments—Mistake—Mutuality.

5. Where a mistake in a mortgage by which a mortgagor was, contrary to alleged agreement, rendered liable for deficiency was on his part only, the mortgage must stand, on the principle that the writing contained all the terms, in the absence of fraud or mistake.

Reformation of Instruments—Mistake—Status Quo.

6. Where defendant, having made, as he alleged, an agreement to give a mortgage without liability for a deficiency, tendered a mortgage making him personally liable, it was competent for the mortgagee's attorney to accept it, and it could not be reformed without placing the mortgagee in the *status quo* by restoring another mortgage, in discharge of which the mortgage sought to be reformed was given.

From Multnomah: CALVIN U. GANTENBEIN, Judge.

Department 1.

The plaintiff, Manley, brought this suit to foreclose a mortgage executed by Milton W. Smith, Alice Smith, his wife, and Thad Sweek, to secure a note signed by the Smiths and Alex Sweek. The mortgage contained a covenant in these terms:

"And the said parties of the first part (the mortgagors) for their heirs, executors and administrators, do covenant and agree to pay to said party of the second part, his executors, administrators or assigns the said sum of money as above mentioned."

The only defendant answering is Thad Sweek, one of the mortgagors. The substance of his defense is that the quoted clause was inserted in the mortgage by the mutual mistake of Manley and the other parties to the transaction. He prays that the instrument be corrected by the elision of that clause and that the mortgage as thus reformed be foreclosed.

His averments in that behalf were denied by the reply. A decree was entered reforming and foreclosing the mortgage according to the prayer of Thad Sweek, and the plaintiff appeals.

REVERSED.    DECREE RENDERED.

For appellant there was a brief over the name of *Messrs. Brice & Masters,* with an oral argument by *Mr. W. Y. Masters.*

For respondent, Thad Sweek, there was a brief and an oral argument by *Mr. J. F. Shelton.*

BURNETT, J.—Mrs. Smith, is a sister of the Sweeks. According to the testimony, she and her husband were indebted to Manley in the sum of $1,400 for money loaned to them on their note given previous to the one in suit. Her husband was declared a bankrupt and about that time Manley began an action on the note he then held and attached real property of Mrs. Smith sufficient to satisfy his claim. At this juncture Alex Sweek approached Manley with a view to securing the claim, obtaining an extension of time and releasing the attachment. It seems that Mrs. Smith had one lot and that Thad Sweek had another lot and a fraction adjoining, composing the realty described in the mortgage now in question. Both were encumbered by a previous mortgage. Alex Sweek testifies:

"So I went to Mr. Manley and told him I thought I could get a second mortgage on those two lots, or whatever it was, two lots and a fraction, for what was coming to him; that I would be willing to sign the note, and I was satisfied that Thad would sign the mortgage, so far as binding his lot was concerned, but he would not sign the note and would not become responsible, so we finally agreed upon that. Mr. Manley agreed to do that, and somebody prepared the mortgage; I don't know who, not me, but somebody prepared the mortgage. * * My recollection is this; that after I talked to Mr. Manley, he was going away, and he turned the matter over to his attorney, W. Y. Masters, but I am not sure about that. My recollec-

tion is that Mr. Manley was going out of town, and after we talked over and agreed upon the completion of the mortgage, as I remember, he went away, I may be wrong, but that is my recollection. It is a long time ago, and I haven't paid much attention to it.''

On cross-examination he stated:

''There wasn't any talk about the promise to pay in the mortgage, so far as the talk was concerned, but it was understood that my brother Thad would not be responsible for the debt. There wasn't any talk about putting in a clause or striking out a clause. * * No; but the understanding was that my brother Thad would not be responsible for the debt, if he would put in the lot.''

He said further in substance that he took up the matter with Mr. Manley and W. Y. Masters but that he did not have any discussion with the latter that Thad was not to be bound. The only negotiation between Thad Sweek and Manley is detailed by the former in his testimony as follows:

''I met him [meaning Manley] in the entrance to the Board of Trade Building once, and he asked me what we were going to do about it. * * In the first place as it was presented to me one time, it was wrong. * * The mortgage had no release clause in it, and in the copy of the note in the mortgage it had my name to it, and I wouldn't sign it.

''Q. You had not signed any note?

''A. No; I had not, and it was definitely understood that I should not; that I was putting up my property to assist in it, and it was all that I would do, and definitely understood at all times.

''Q. Now, you spoke about a release clause not being in the first mortgage.

''A. I mean the first copy of this mortgage here; not the first mortgage, but when this first draft of this was shown to me it was that way.

''Q. That is, there wasn't any release clause in it?

"A, No. I mean there was no provision releasing my lot when the first mortgage was put on, and also the copy of the note in the mortgage bore my signature to it, in the copy here as it was typewritten.

"Q. And, as I understand it, in that first draft of the mortgage there wasn't any release clause as it is now contained in the present mortgage, as follows: 'It is agreed that the mortgagee will release lot 3 and the south 5 feet of lot 2, whenever the existing mortgage of $2,000.00 upon lot 4 is fully paid?'

"A. Yes.

"Q. That was not in the first draft of the mortgage?

"A. No; nothing about that.

"Q. And you refused to sign it for the reason that was left out, and for the further reason that in the copy of the note in the mortgage your name appeared upon it?

"A. It did; yes.

"Q. Now, was there anything said between you and Manley at that time that you were not to become personally liable?

"A. Well, I couldn't say that there was any specific agreement to that effect, but that was—or the exact words that were said, but I indicated that to the best of my ability. Of course, it is a long time ago, and it is pretty hard to say just the exact words that were used between people in a casual meeting."

Nobody seems to know who actually prepared the mortgage although it was introduced in evidence. It is in a printed form in which the blanks except signatures are filled in typewriting. Neither of the witnesses to its execution was called to testify. As stated by Thad Sweek, he objected to the first draft presented to him on account of the note having his name to it and because the instrument did not contain a clause releasing his lot and a fraction when the prior mortgage on the property should be satisfied. Speak-

ing of the mortgage in suit Thad Sweek gave evidence as follows:

"Q. Did you look at the mortgage at that time, to ascertain whether or not the corrections that you had previously objected to had been made in the mortgage?

"A. Well, I looked at it to see that the release was in there—I remember distinctly, to see that this release provision was in there, and also that my name was not on the copy of the note in the mortgage. I looked at it that far, and I presume that I might have read more. I am not sure whether I did or not, but probably not, because my brother had telephoned to me—my brother Alex had telephoned to me that the mortgage was now proper—corrected and proper to be signed, and that Mr. Smith would take me to have it executed, or would bring it to me to have it executed, and Mr. Milton Smith went with me to this office in the Board of Trade Building, where the mortgage was executed, and seeing that those provisions were in there, and he telling me that, I might have taken it for granted, without being very careful. I am not very sure just now about that.

"Q. Now, I will ask you this question; if you had read the mortgage over, and saw the clause in the mortgage to the following effect, 'And the said parties of the first part, for their heirs, executors and administrators, do covenant and agree to pay to said party of the second part, his executors, administrators or assigns, the said sum of money as above mentioned,' would that have meant anything to yourself?

"A. No; I had always considered that in executing a mortgage that there would be no deficiency obtained against you, unless you had also signed the note. I find that I erred in that belief, but I had always thought so anyway, until this suit came up. That had been my firm belief at all times. I thought that there could not be a deficiency secured against you, unless you had actually signed the note."

On cross-examination he testified thus:

"Q. You say you read this clause in the mortgage referred to there by Mr. Shelton, where you agreed and promised to pay, and so forth?

"A. I don't know as I did, but if I had read it it wouldn't have meant anything to me.

"Q. It wouldn't have meant anything to you?

"A. No.

"Q. You would have signed it just the same?

"A. Yes.

"Q. The reason that you would have signed it if you had seen that there, and known it was there, was because of the fact that you believed they could not get a deficiency judgment against you on the mortgage?

"A. I did believe it.

"Q. And that was your reason for signing it?

"A. Something might have called my attention to it.

"Q. Now, you say that you took this matter up with your brother Alex in his office, and you discussed this matter about your liability, with your brother, on the mortgage, and so forth?

"A. Well, there wasn't any great discussion.

"Q. And the first mortgage you refused to sign, because you thought you would be liable?

"A. Yes.

"Q. And your brother is an attorney, and he was acting for you and looking after your interests too, I presume?

"A. There were other reasons for not signing the first mortgage beside that."

Manley, as a witness for himself, narrates the original loan of money to the Smiths, the commencement of the action and attachment and says:

"I was then busy, getting ready to leave the city for an extended trip, and Mr. Alex Sweek came into my office and spoke of this suit, and was very anxious to arrange whereby it might be dismissed, and wanted to know if I needed the money, and I said, 'No; I don't need the money now. I am going away in two or three

days. I don't especially need the money, but I want to be sure that I am going to get it.' 'Well,' he says, 'if we arrange to give you a note and mortgage on real estate, due in a year, good security, would you be willing to dismiss that case and accept new securities?' 'Well,' I says, 'if the securities are ample—if the security which you can give is ample to secure the note beyond any question'—I says, 'this note here I have sued on has been running for several years, and I am unable to collect it, and I don't care to release this attachment suit unless I can get ample security.' So he made some proposition to me about giving a mortgage on Mrs. Smith's lot and a lot that he said belonged to his brother Thad, and I listened to him—we only had a very few moments' talk—I listened to his proposition, and I said, 'Well, Alex, I don't know much about—I am not much acquainted with Mrs. Smith, and I am not much acquainted with Thad Sweek. I do know you. Will you sign this note as additional security, as a joint owner?' And he said he would. 'Now,' I says, 'I haven't got time to pass upon this property or examine it, or go into the matter at all.' I says, 'I am going to leave the city'—I think the next day, or within two or three days at the farthest, which I did, and I says, 'I will take this matter down to my attorneys who brought this suit, and give them instructions to release this attachment if you give ample security to secure the payment of the money at the end of a year'; and Mr. Sweek said that that could be arranged easily, and he seemed to be very much satisfied about it, and I says, 'I will tell you, Mr. Sweek, what I will do further. If you give security which is satisfactory and ample, I will reduce—instruct my attorneys to reduce the interest on that note to seven per cent instead of eight,' which was done.''

He also states he instructed his attorney that he might release the attachment if the securities and everything which was offered to them for the new loan were ample and unquestionable; that he then left and was gone seven months and never saw the mortgage or

the note until after he returned from Europe and knew nothing at all of the details of the transaction. He expressly denies that he had any agreement with Thad Sweek or with Alex Sweek that the former would not be liable to him on the mortgage or that it would only be a lien on the lot or a second mortgage. He declares on cross-examination:

"I told Mr. Sweek positively that I didn't have time to go into the details and to examine the titles, or to look after the details of the transaction at all, or securities or mortgages or notes, or anything of that kind at all, because I was leaving right away and didn't expect to be back in a number of months. Now, this mortgage and this note, I never saw the note; was not in the city when it was executed. I had been away a number of days, and never saw it, and never even had a communication from my attorneys in relation to it, and knew nothing about the details of the transaction for over seven months, until my return."

Mr. Masters, the attorney who conducted the matter on behalf of plaintiff, testifies thus:

"Well, after the suit had been filed and attachment brought, Mr. Milton Smith and Judge Sweek came in to see me about the matter. They had been negotiating with Mr. Manley, I think, before they saw me, but I can recall one occasion that Mr. Smith and Mr. Sweek came in, and they proposed to give a mortgage, including another lot, I think, adjoining this property that Mr. Manley had a mortgage on, or give a mortgage on the same lots and an additional lot belonging to Thad Sweek. Thad Sweek was going to guarantee the payment of the note, as I remember, * * and some days after, I think, Mr. Smith came around and brought the note and mortgage into the office, covering this property. I do not now recall the lots and blocks. I had a memorandum at that time in the desk, and I checked it up and saw that it corresponded with what Mr. Manley had told about the matter in instructing me, and that note and mortgage was received in satis-

faction of the suit pending, and the case was dismissed, as I remember now.

"Q. Did you ever see this mortgage before it was brought in to you?

"A. No; that was the first time I ever saw that mortgage, was when they brought it in to me signed.

"Q. You were the attorney that looked after this attachment suit, and the dismissing of it and accepting the new mortgage, weren't you?

"A. As I remember, I had the handling of the whole of that; yes. I think I brought the other action also.

"Q. Was this mortgage prepared in the office of Masters, Brice & Masters?

"A. It was not.

"Q. Was there anything said in the conversation you had with Judge Sweek or Mr. Smith relative to Thad Sweek not agreeing to pay or assume the obligation, but simply offering the lot as a lien?

"A. No; there wasn't any proposition of that kind. My understanding was that he was guaranteeing the note."

In rebuttal Alex Sweek denies Masters' version of the conversation and says he told the latter that Thad Sweek put in the lot but would not sign the note or become liable for the debt. Milton W. Smith was produced as a witness for the defendant but did not state anything material to the decision of the issue. Mrs. Smith was not a witness. At the hearing it was agreed that the attachment covered lot 4 and the south 10 feet of lot 7 in block 113 and lots 5 and 6 in block 136 in Carruthers' Addition to South Portland. The mortgage in suit includes lots 3 and 4 and the south 5 feet of lot 2 in block 113 and the part to be released on payment of the previous mortgage was lot 3 and the south 5 feet of lot 2.

The degree of proof required to establish mistake is thus summarized in 10 R. C. L., p. 300, Sections 43 and 44:

"The exercise of the power to correct mistakes in written instruments trenches on the rule that parol evidence ought not to be admitted to vary that which is written, and therefore courts of equity act with caution in the matter. The rule in the courts of law is that the writing contains the true agreement of the parties, and that it, therefore, furnishes better evidence of the sense of the parties than any that can be supplied by parol. Equity, however, has a broader jurisdiction, and will open the written contract to let in matters arising from facts perfectly distinct from the sense and construction of the instrument itself, proceeding on the theory that the previous oral agreement subsists as a binding contract, notwithstanding the attempt to put it in writing; and on clear proof of its terms the court ought to make the writing conform to the actual agreement; but the mistake must be made out by the clearest evidence, according to the understanding of both parties, and on testimony exact and satisfactory. Slight suspicions, vague presumptions, bare possibilities, will not do, for, if parties understand an agreement differently, and neither of them makes known to the other his construction of it, and it is afterwards reduced to writing and duly executed, they are both bound, in equity as well as at law, by the terms of the written instrument, which in such cases is to be construed by the court. * * The general rule, subject to certain exceptions, is that in order to justify relief from a contract on the ground under consideration, the mistake must have been mutual. A mutual mistake in equity is a mistake reciprocal and common to all the parties to a contract or written instrument. It may arise in connection with the facts on which a contract is based, but usually it is a mistake where all alike labor under a misconception respecting the contents or the legal effect of the contract or instrument. Where each party to a deed misunderstands the understanding of the other in regard to land which is agreed to be conveyed, there may be a common though not a mutual mistake as to the subject matter of the contract. But while mistakes in the intention of one only

of the parties are not generally relievable in equity this rule does not apply where one of the parties only is under such mistake, either of the facts or the stipulations of a contract, and such mistake has been occasioned by the fraud, concealment, misrepresentation, deceit or imposition in any form of the other.''

The same volume on page 297, in speaking of the effect of negligence sums up the doctrine thus:

''But ignorance of a stipulation in a contract is no ground for relief, where there is no evidence that he was deceived or misled by any misrepresentation or concealment thereof, and his mistake must be ascribed solely to his own carelessness or inattention, as, for instance, where he executes a written instrument without reading it or having it read to him. Also it is generally held that a party may have relief in equity from a judgment at law only when he has been deprived of a legal right by fraud, accident, or mistake, unmixed with negligence or fault on his part.''

It is undisputed that the preparation of the instrument in question rested entirely with the answering defendant and his advisers. He says himself that his brother, an experienced attorney, advised him that the instrument was all right. Without contradiction the plaintiff states that he never saw either the note or the mortgage in question until some months after their execution and knew nothing about the details of the matter until then. The attorney who conducted the matter for him declares that he never saw the instruments until they were completed and submitted to him for examination. Neither the plaintiff nor anyone acting for him is shown to have any knowledge of the first draft of the mortgage or of Thad Sweek's objections to it. The immediate parties, Manley and Thad Sweek are entirely at variance as to the negotiations. The latter spoke but once to Manley on the subject and

then only to tell him that he would sign the mortgage when it was fixed to suit him. He was represented from the beginning by his brother, who of course does not agree with Manley about the terms of the offer they made. The latter's understanding was that they proposed to give security and on that basis he left the details both as to the form and the sufficiency of the collateral to his attorney and so informed Alex Sweek. The matter was evidently left to the Sweeks and Smiths to prepare the papers and submit them to the plaintiff's attorney for approval. There is no pretense that the plaintiff or anyone else for him sought to influence the defendant as to the form or terms of the mortgage. It was entirely the act of Thad Sweek and his relatives that the tender of security was made in the form in which it appears.

1–3. The evidence as to the terms of the negotiation is not of that clear and convincing sort required by the rules of equity to overturn the deliberate deed of the parties. Besides this we have Alex Sweek testifying one way and Manley another on that particular point. The burden of proof rests upon the answering defendant to establish his contention by the preponderance of the evidence. Conceding that Alex Sweek and Manley are of equal credibility the latter is entitled to the presumption that the private transaction in dispute was fair and regular: Section 799, subd. 19, L. O. L. This at least would leave the case between the parties at a balance on the weight of testimony, if not establishing a superiority of proof in favor of the plaintiff.

4, 5. Moreover, the answering defendant himself is at fault or at least negligent in not perceiving and comprehending the terms of the instrument which he

signed.   The rule is thus stated in *Bidder* v. *Carville,* 101 Me. 59 (63 Atl. 303, 115 Am. St. Rep. 303) :

"While a court of equity may decree the rescission of a contract for a mistake which is unilateral, the power should not be exercised against a party whose conduct has in no way contributed to or induced the mistake, and who will obtain no unconscionable advantage thereby.   Equity assists only the vigilant.   It does not relieve against mistakes which ordinary care would have prevented.   Conscience, good faith and reasonable diligence are necessary to call a court of equity into activity."

In the instant case the form of the mortgage is the defendant's own doing assisted by his brother.  · The plaintiff had nothing to do with it either in person or by another.   He obtains no unconscionable advantage. On the contrary he waived the undoubted benefit of security by ample attachment and extended the time of payment at a reduced rate of interest.   He should not now be made to suffer on account of something with which he had nothing to do and for which he was not to blame.   In *Powers* v. *Powers,* 46 Or. 479 (80 Pac. 1058), the effort of the plaintiff was to set aside a deed to the defendant which she claimed was induced by the fraud of the latter as to its form and legal effect.   Mr. Justice BEAN sums up the case thus:

"The plaintiff was in full possession of her mental faculties at the time the deed was executed, and fully competent to transact business.   Her testimony in relation to the transaction is uncertain and indefinite, and is flatly contradicted by the defendant.   Out of all the contradiction and confusion, however, stands the deed, solemnly executed by her, conveying the property in question to her son.   From her own testimony she was negligent and careless in signing it without reading it or having it read to her or making some inquiry as to its contents.   There is no testimony that

the defendant made any representations to her at the time as to the nature or character of the instrument, or that he attempted or endeavored to deceive her in any way. There is no proof that he caused the instrument to be prepared, or that it was prepared at his suggestion.''

The analogy between that case and the present is strong in its circumstances favoring the support of the instrument in question. That the instrument which a person in the possession of his faculties signs without reading or reads carelessly binds him is established by the following authorities: *Spitze* v. *Baltimore & O. R. Co.,* 75 Md. 162 (23 Atl. 307, 32 Am. St. Rep. 378) ; *Hoeger* v. *Citizens' Street R. Co.,* 36 Ind. App. 662 (76 N. E. 328) ; *Atchison, T. & S. F. R. Co.* v. *Vanordstrand,* 67 Kan. 386 (73 Pac. 113) ; *McNamara* v. *Boston Elevated R. Co.,* 197 Mass. 383 (83 N. E. 878) ; *Leddy* v. *Barney,* 139 Mass. 394 (2 N. E. 107) ; *Mateer* v. *Missouri P. Ry. Co.,* 105 Mo. 320 (16 S. W. 839) ; *Missouri, K. & T. Ry.* v. *Craig,* 44 Tex. Civ. App. 583 ; *Watson* v. *Planters' Bank,* 22 La. Ann. 14; *Eldridge* v. *Dexter & P. R. Co.,* 88 Me. 191 (33 Atl. 974) ; *Leslie* v. *Merrick,* 99 Ind. 180; *Hawkins* v. *Hawkins,* 50 Cal. 558; *Starr* v. *Bennett,* 5 Hill (N. Y.), 303; *Gibson* v. *Brown* (Tex. Civ. App.), 24 S. W. 574. Still further, the mistake is not shown to have been mutual between the parties. The evidence is clear that they did not understand the preliminary negotiations alike. Under such circumstances the contract as executed must be allowed to stand on the principle that when parties have reduced their covenants to writing it must be held to contain all the terms in the absence of fraud or mutuality of mistake: *Lewis* v. *Lewis,* 5 Or. 169; *Stephens* v. *Murton,* 6 Or. 193; *Epstein* v. *State Ins. Co.,* 21 Or. 179 (27 Pac. 1045) ; *Kleinsorge* v. *Rohse,*

25 Or. 51 (34 Pac. 874); *Mitchell* v. *Holman*, 30 Or. 280 (47 Pac. 616); *King* v. *Holbrook*, 38 Or. 452 (63 Pac. 651); *Stein* v. *Phillips*, 47 Or. 545 (84 Pac. 793); *Bower* v. *Bowser*, 49 Or. 182 (88 Pac. 1104); *Smith* v. *Interior Warehouse Co.*, 51 Or. 578 (94 Pac. 508, 95 Pac. 499); *Leonard* v. *Howard*, 67 Or. 203 (135 Pac. 549); *Sayre* v. *Moir*, 68 Or. 381 (137 Pac. 215); *Coates* v. *Smith*, 81 Or. 556 (160 Pac. 517).

6. Finally the defendants were offering the security. It was incumbent upon Thad Sweek to tender it in the proper form as he understood it. He was not bound to carry out the tentative agreement which he says was made with Manley by his brother. The way was open for him to offer different or even better collateral and the attorney for the plaintiff had the right under the discretion conferred upon him by his principal to accept as such the security offered. By means of the mortgage as tendered, the answering defendant secured the release of the two lots in block 136 on behalf of his sister thus making a material change to the disadvantage of the plaintiff. It would be inequitable now to reform the instrument in suit unless the defendants should do equity by restoring the plaintiff to the position which he occupied at the time the mortgage was tendered. The defendant should not be allowed to take advantage of part of the transaction and escape from the remainder. The argument of the defendant that the contested clause does not operate to charge Thad Sweek with the debt, even if allowed to remain as part of the mortgage, is ingenious but not convincing. In our judgment it binds him and that seems to have been his opinion when he put in his answer.

In brief, the alleged mistake is not clearly and satisfactorily established by a preponderance of the tes-

timony. Having the matter entirely in his own control, the answering defendant was negligent and inattentive to his own interest in allowing the instrument to go to execution in its present form. Induced by the securities offered the plaintiff materially changed his position to his disadvantage by releasing the additional property attached. The defendant does not do equity, nor offer it, by restoring the plaintiff to his former situation. For these reasons the decree of the Circuit Court respecting the defendant Thad Sweek is reversed and one here entered against him not only foreclosing the mortgage but granting recovery from him personally of the amount of the debt.

REVERSED. DECREE RENDERED.

MCBRIDE, C. J., BENSON and HARRIS, JJ., concur.