Argued 24 January, decided 20 March, 1906.

**STEIN *v.* PHILLIPS.**

84 Pac. 793.

REFORMING WRITTEN CONTRACTS FOR MUTUAL MISTAKE.
1. A party seeking the reformation of a writing on the ground of mistake must show decisively what the mistake was and that it was mutual, as to which points he must overcome the strong presumption that a written contract correctly expresses the intent of its signers.

EVIDENCE OF MUTUAL MISTAKE.
2. The evidence in this case does not clearly show that the writing in question incorrectly states the agreement of the parties, and a reformation must be denied.

From Multnomah : ALFRED F. SEARS, JR., Judge.

Statement by MR. CHIEF JUSTICE BEAN.

This is a suit by Philip Stein against R. E. Phillips and his wife to reform a written instrument, and for specific performance as reformed. For some time prior to May 2, 1903, the plaintiff occupied a store in a building in Portland belonging to Mrs. Grant, and the defendant used one

adjoining on the north. Mrs. Grant contemplated constructing a new building on the premises, and the defendant, who was desirous of securing better accommodations for his business, applied some two or three months prior to the date mentioned to rent the new building when completed. While his application was pending, and on May 2, 1903, he entered into the following written agreement with the plaintiff:

"This is an agreement between R. E. Phillips, of the first part, and Philip Stein, party of the second part, to wit: It is understood that the basis of the contract rests upon the provisions that the party of the first part, R. E. Phillips, does become the lessee of a certain building to be erected on the corner of Third and Pine streets, fronting fifty feet on Third Street and one hundred feet on Pine Street, three stories high. The said party of the first part, R. E. Phillips, does hereby agree to let the party of the second part, Philip Stein, share equally with him the profits or losses that may accrue from any mutual use that they may make of said lease. In consideration of the above, the party of the second part, Philip Stein, agrees to advance money to buy furniture for rooms upstairs (thirty-four in number) not to exceed $2,000; same furniture to be purchased by R. E. Phillips and Philip Stein jointly. The party of the first part, R. E. Phillips, agrees to pay the party of the second part, Philip Stein, one-half the purchase price of said furniture in installments of monthly payments not less than $20 per month. It is further understood that R. E. Phillips agrees to pay to Philip Stein one-half the loss, if any, in case of business failure. Also R. E. Phillips agrees to let profits accruing from said building to apply to payment of said one-half purchase price of said furniture.

R. E. Phillips.<br>Phil Stein."

Thereafter on July 28th the defendant jointly with his wife secured a lease of the proposed building for five years at a monthly rental of $425 with the privilege of an extension for another five years at $500 a month. About the

time the building was completed he rented the second and third stories thereof for a lodging house, and soon thereafter plaintiff tendered to him or offered to furnish $2,000 with which to purchase furniture for a lodging house in the second and third stories, but the defendant refused to accept it or otherwise to recognize plaintiff's rights in the building, except that he offered to rent him a storeroom therein at $75 a month. The plaintiff thereupon brought this suit to enforce specific performance of the agreement of May 2d. In his original complaint he set out the agreement in full; alleged that after the making thereof the defendant secured a lease of the building, but failed and refused to comply with such agreement, and prayed for a decree for the specific performance thereof and for the appointment of a receiver to take possession of the building, collect the rents, etc. A demurrer to the complaint was sustained, and plaintiff thereupon filed an amended complaint alleging, in substance, that the contract between himself and the defendant was that they should be equal partners in the lease thereafter to be acquired by the defendant; but that by mutual mistake the written memorandum did not correctly state the terms of their agreement, and praying for a decree reforming that instrument, and for other relief as in the original complaint. The answer denied the material allegations of the amended complaint, and, for a further defense, alleged that on May 2, 1903, plaintiff and defendant entered into an agreement whereby it was understood and agreed that in consideration of plaintiff's refraining from applying for a lease of the proposed building the defendant would, in case he secured the building, sublet to plaintiff a storeroom on the ground floor at a monthly rental of $75, and that they would conduct and carry on jointly a lodging house in the upper stories; that plaintiff was to advance $2,000 for the purpose of purchasing furniture for such lodging house and de-

fendant would repay him one-half thereof; that the contract set out in the complaint was prepared and entered into as a memorandum of such contract; that in violation of the agreement the plaintiff made application to the owner to rent the building, offering $450 a month for it, with knowledge that the defendant had bid $425 a month; that the applications of both parties were rejected by the owner and the building was subsequently leased to the defendant and his wife jointly; that plaintiff has no interest whatever in such lease and never had any interest therein. The reply put in issue the material allegations of the answer and, upon a trial, a decree was rendered in favor of the plaintiff, and defendant appeals.         REVERSED.

For appellant there was a brief over the name of *Dolph, Mallory, Simon & Gearin*, with an oral argument by *Mr. Joseph Simon*.

For respondent there was a brief over the names of *Bernstein & Cohen* and *Carey & Mays*, with an oral argument by *Mr. Alexander Bernstein*.

MR. CHIEF JUSTICE BEAN delivered the opinion.

The written agreement, as we interpret it, did not vest in the plaintiff any right or interest in the leasehold estate which it was contemplated the defendant would subsequently acquire. It is true the proposed lease was the basis of the contract between the parties, and such contract was contingent upon the defendant's subsequently becoming the "lessee" of the building, but the agreement was that if the defendant secured the lease he would permit the plaintiff to share equally with him in the profits and losses that might "accrue from any mutual use" that they might make of it. In consideration of which plaintiff agreed to advance $2,000 to purchase furniture for the upper stories of the building, the defendant to repay him one-half of the money so advanced in monthly installments and to share

in the losses in case of a business failure. The agreement plainly contemplated that defendant should become the lessee of the building, and that the lease should be taken and held by him in his own right, but that he and the plaintiff should share equally in the profits and losses of any mutual use they might make of it. By such agreement the plaintiff acquired no interest in the leasehold estate, as such, any more than he would have acquired in the title, had the contract been made in view of the defendant's purchasing the property. There was no agreement that plaintiff should be a partner in the lease, but it was to be the sole property of the defendant, and the plaintiff's rights were confined to such mutual use as the parties thereafter might make of the building. A breach, therefore, of the contract by the defendant would not entitle the plaintiff to a decree adjudging him to be the owner of a one-half interest in the lease.

1. The plaintiff contends, however, that the contract, as actually made, was that he and the defendant were to be partners and equal owners in the lease which defendant was to secure, and that by mutual mistake the writing does not truly express the terms of the contract between them. Upon this issue the burden of proof is with the plaintiff. He must show by clear and satisfactory proof, not only that there was a mistake in the writing, but that such mistake was mutual and shared in by both parties: *Lewis* v. *Lewis*, 5 Or. 169; *Stephens* v. *Murton*, 6 Or. 193; *Epstein* v. *State Ins. Co.*, 21 Or. 179 (27 Pac. 1045); *Kleinsorge* v. *Rohse*, 25 Or. 51 (34 Pac. 874); *Mitchell* v. *Holman*, 30 Or. 280 (47 Pac. 616). "The rule is well settled," says Trayer, J., in *Harrison* v. *Hartford Ins. Co.* (C. C.) 30 Fed. 862, "that an application to reform a written contract on the ground of accident or mistake must be supported by clear and satisfactory proof, otherwise it will not be granted. If the testimony is conflicting, or of such undecisive character as

to raise a substantial doubt in the minds of the court, the contract as written must stand. Besides the ordinary burden of proof which rests upon every litigant who holds the affirmative of an issue, there is in this class of cases the additional burden of overcoming the strong presumption created by the contract itself, which the proceeding seeks to reform."

2. Now, the evidence consists principally of the testimony of the two contracting parties and is in direct conflict in many important particulars. The plaintiff testifies that defendant told him, two or three months before the contract was made, that the old buildings on the property were to be torn down and a new one erected, and that if he (witness) wanted to "get in on it" he would try to get the building; that he (witness) said : "All right; I want to get a store ;" that defendant afterwards represented to him that he had made several attempts to get the building and finally told him that the property had been so divided up by the owners that he did not care whether he got the proposed building or not, and did not think he would take a lease ; that witness then said to him : "If that is the case, I am going after the building, I want a store "; that witness thereupon had an interview with the agent of the owner and told him that he "wanted to get a store and if necessary I would take the building in order to secure the stores"; that the agent said to him that other parties were then negotiating for the building and until he heard from them he could not make any contract with reference to it, but that most likely he (witness) would be able to to get a store in any event because the other parties, if they secured the building, would have a store to let. He continues that he made other efforts to secure the building, but could not do so ; that he was afterwards informed that the defendant had rented the building and called to see him about it, and was told that the report was true, and

witness said to him: "You said you would make me a prop-
osition on the store," and the defendant said: "When the
building is up, who pays the most gets the building"; that
this conversation occurred on the morning the written
contract was made; that witness desired to find out whether
the defendant had in fact rented the building and himself
put in a bid for it at a rental of $25 more a month than
the defendant had offered; that this was done without the
defendant's knowledge, and he did not tell him because he
did not think he had secured the building and was trying
to get it himself. He further says that after putting in this
bid and on the same day he went back to the defendant
and told him: "I might get a store in this building yet,"
and the defendant said: "What would you do if I took you
in on the building"? And I said: "I will take the build-
ing and furnish it up and make all I can out of it. Rent the
building furnished as a lodging house or sell it for a lodg-
ing house." He said: "I have no money for anything like
that." And I says: "If you give me a fair deal I will put
up the money all right;" that he and the defendant then
went into his store and the written agreement was there
prepared and signed; that afterwards when the owner of
the property came to execute a lease to the defendant she
demanded a bond to secure the payment of the rent, and
the defendant offered the witness as surety thereon, but
there was some technical defect in the bond, as prepared,
and the witness declined to sign it until corrected, and in
the meantime the owner concluded not to take him as
surety, but to exact a real estate mortgage, and thereupon
property belonging to the defendant's wife was given as
security and the lease made to her and her husband jointly;
that the property offered by the defendant's wife was in-
cumbered at the time and it was necessary to obtain a re-
lease of the mortgage and for that purpose the witness ad-
vanced to the defendant $500 which was so used; that after

the lease was executed the defendant offered to witness a storeroom in the building but would do nothing more for him except to repay him the $500 advanced, which he offered to do.

In answer to a direct question the witness said the understanding was that he and the defendant were to be partners in the building, but upon being asked what he understood the partnership to be, said :

" It was understood that we should both get a building, get a store, each one of us, and then do the best we can with the rest.

Q. What do you mean by that ?

A. Either rent it out or partition it off, get the most out of it that we could. I suggested the idea it would be a good thing to furnish it all in order to sell it, I thought it would be a good thing, the fair was coming on, I thought it would be a good investment. He said he did not have the money to go into anything like that."

In another place the witness says that the partnership was to be in the building and that they were to rent the stores or use them, paying a proportionate rent ; that witness was to have one store and the defendant another ; and that defendant was to secure the lease and give witness a written contract to that effect. On cross-examination the following inquiries were asked and answered :

" Q. Didn't you, in the start of this thing, have a conversation with Mr. Phillips in which you said to him that you understood he was to put in a bid for $425 for this building and, if he did, you would bid $450 ; you would raise his bid and get it anyway ?

A. I do not remember telling anything like that.

Q. And then after you said that to him, after he had made some reply, didn't you people come together and say, 'There is no use in our bidding against each other in this way.' Didn't you say, 'All I want is this store ?'

A. I naturally wanted a store ; the only way I could get it was to get the building.

Q. Didn't you say to him—

A. That I wanted a store?

Q. Yes.

A. That is true enough.

Q. Is not that all you wanted out of it, was your store? The store you now occupy?

A. I said at the time I understood he had the building.

Q. You did say it, didn't you?

A. I did say after I understood he had the building, I told him, 'Well, if you have got the building, let me have the store.'

Q. When was that conversation?

A. That very morning that he said he had the building.

Q. The morning the paper was drawn up?

A. In the afternoon the paper was drawn up.

Q. In the morning of that day was the time you say you said all that you wanted was that store?

A. I said: 'If you secure the building what proposition will you make me on the store'? He says, 'Whoever pays the most gets the store.'

Q. Up to that time you never had had a conversation about the store?

A. We were continuing to figure beforehand.

Q. Was not the first thing you talked about at all?

A. Yes, that is what it was, when he was to go to bid, he says, 'I will get a store' and he gets a store.

Q. He said, 'All I want out of it is my store,' and you said: 'All I want out of it is my store?'

A. Such as I have got now.

Q. All you wanted at that time was a store, and all he wanted was a store?

A. Yes, that is what I wanted.

Q. And then he was to get the lease? You were not to get a lease?

A. No, he was to get the lease.

Q. There was no provision made in case you got the lease?

A. No."

The defendant testifies that he was a tenant of the owner of the property for several years; that two or three

years before the contract in controversy was entered into, he made a proposition to the owner that if she would put up a building he would lease it for a term of years, but nothing came of the matter at that time; that in March, 1903, the agent of the owner informed him that the owner would then entertain a proposition for the erection of a new building, and he and the agent came to an understanding about the matter, subject, however, to the approval of the owner; that before the arrangement was consummated and a lease executed, the plaintiff stopped him on the street and told him that he (plaintiff) was after the building and was going to offer $450 a month for it; that he wanted a storeroom and that he would not bid on the building if the witnesses would agree that he might have a storeroom on some satisfactory terms; that witness told him that if he wanted a room he himself did not desire, he would gladly aid him to get it; that the written agreement was thereupon dictated by the plaintiff, written by the defendant, and signed by the parties; that the understanding was that the plaintiff should have a storeroom in the proposed building and that they should be mutually interested in the use of the upper stories; that plaintiff was to furnish $2,000 to buy furniture and witness was to repay him $20 a month and all that might be earned from their joint venture until his one-half so advanced was repaid; that plaintiff was to have a storeroom at a rental of $75 a month, but did not want such a provision put in writing; that plaintiff was to have no interest whatever in any other part except in any joint use that might be made of the upper stories; that it was understood that plaintiff was not to bid on the building, but in violation thereof he offered $450 a month therefor; that when the owner of the property came to execute the lease she demanded security for the rent, but refused to accept the plaintiff as surety and wanted a thousand dollars put

up in cash; that he (witness) could not furnish the money and his wife mortgaged her property to secure the payment of the rent and the lease was made to witness and his wife jointly; that it was never agreed that witness and plaintiff should be partners in the lease, but the understanding was that in case they should furnish and use the upper stories as a lodging house, they should be partners in the venture; that the only thing the plaintiff wanted was a storeroom, and witness was willing to let him have such room if he would refrain from bidding on the building, but that matter and the stipulation in reference to the rent of the storeroom were not inserted in the written agreement because plaintiff objected; that the $500 obtained by the witness from the plaintiff was not for the purpose of paying a mortgage on his wife's property, but for use in his business, and witness has offered to repay the same prior to the commencement of this suit; that the contract in question was dictated by the plaintiff and written by witness, and afterwards plaintiff refused to pay $75 a month for a storeroom because there was no such stipulation in the writing, and he claimed the rent was too high; that witness and plaintiff consulted several parties in an attempt to come to some understanding about the rent, but were unable to do so, and he rented the upper stories to another party for a lodging house, and thereafter plaintiff offered to advance the money with which to purchase furniture. This is the substance of all the evidence concerning the agreement between the parties and the making of the written contract, except the testimony of a brother of the plaintiff who claims to have been present when the written agreement was prepared, but he has so plainly confused what he heard with what some one has told him that his testimony is of but little moment.

We have thus set out the testimony at much length for the reason that we think it clearly shows that a mutual

mistake in the written contract is not made out in that clear and satisfactory manner which the law requires. The evidence is too conflicting and uncertain to support a decree changing or modifying a written agreement deliberately entered into by the parties. It would be difficult to tell from the plaintiff's testimony, with any considerable degree of accuracy, just what the contract was, or wherein the written agreement is not as the parties intended it should be, or what was omitted therefrom by mistake. But, however this may be, the plaintiff is contradicted by the defendant, who denies that there is any mistake in the written agreement, and says that it is as the parties intended it should be. It is true he testifies that the agreement that plaintiff should refrain from bidding on the building and should have a storeroom therein at a rental of $75 a month was omitted, but this was done by consent of both parties. The defendant says these matters were omitted because plaintiff objected to having them inserted in the written contract, while plaintiff asserts that no such stipulations were ever entered into. So there can be no mistake in this respect. The most that can be claimed from the testimony is that plaintiff's understanding of the agreement was that he should have a one-half interest in the leasehold estate to be thereafter acquired by the defendant, and that the writing was intended to include such a stipulation. This the defendant denies, and asserts that the contract was that in consideration of plaintiff's refraining from attempting to secure a lease of the building and permitting him to become the lessee thereof, he would sublet to the plaintiff a storeroom therein for $75 a month, and that they should share equally in the profits or losses of any joint use they might make of it. Testimony so conflicting and uncertain is clearly not sufficient to authorize a court in reforming a written instrument.

"To justify a court of chancery," says Mr. Justice Mor-- ton, in *German Am. Ins. Co.* v. *Davis*, 131 Mass. 316, "in· correcting·and reforming a written contract entered into· deliberately, so as to make it conform to an alleged oral contract differing in terms, the proofs of mutual mistake· must be full, clear and decisive. It must appear beyond reasonable doubt that the precise terms of a contract had· been orally agreed upon between the parties, and that the· written instrument afterwards signed fails to be, as it was· intended, an execution of the previous agreement, but. expresses a different contract; and that this is the result. of a mutual mistake. Otherwise, if a contract should be· reformed upon proof of the mistake of one of the parties as to its terms or legal effect, the injustice would be done of imposing upon the other party a contract to which he· had never assented." ·The presumption is that when par-- ties have deliberately reduced their contract to writing· the writing truly expresses the contract as made, and it. can be corrected and reformed by a court only upon clear,. full and decisive proof of a mutual mistake.

Plaintiff has not produced evidence of that character,. and therefore the decree should be reversed, and the com- plaint dismissed.                                   Reversed.