Argued November 1, 1916.
Affirmed January 9, 1917.

# BOTT *v.* CAMPBELL.

(161 Pac. 955.)

**Reformation of Instruments—Evidence—Sufficiency—Mistake.**

1. In a suit to reform a five-year lease of wheat land, one half of which the lessee was to put in crop each year and the other half he was to fallow, evidence *held* to show that it was agreed by the parties that the lessee should receive a reasonable compensation for fallowing during the last summer of the term that portion of the land which he was not to crop that year, and that the provision was omitted from the lease as written by the scrivener, though the terms of the agreement had been stated to him.

> [As to causes and proceedings for reformation of instruments, see note in 65 Am. St. Rep. 481.]

**Reformation of Instruments — Evidence — Sufficiency — Meeting of Minds.**

2. In a suit to reform a lease for mistake, evidence *held* to show that statements by the parties were not mere negotiations leading up to the making of the agreement, but constituted an agreement on which the minds of the parties met, and which by mistake of the scrivener was not set forth in the written lease, so that such statements were admissible under Section 713, L. O. L., excluding parol evidence varying a written instrument, except where a mistake or imperfection of the writing is put in issue by the pleadings.

**Reformation of Instruments—Mistake—Degree of Proof.**

3. Where one of the parties to a written contract is dead, evidence of a mistake in the contract must be carefully scrutinized, and found to be convincing and to show clearly the contract and the existence of a mutual mistake.

**Landlord and Tenant—Construction of Lease—Furnishing Seed.**

4. In a written lease of wheat land for five years which provided that one half thereof should be put in crop each year, and the other half left fallow, a provision that the lessee should cultivate and summer-fallow the lands each year, and would summer-fallow it for the last year, the work to be done in a husband-like manner, and would furnish all seed necessary to sow the same, will not be construed to require the lessee to furnish the seed necessary to sow the part left fallow during the last year, from the crop on which he would get no benefit, but only that he would furnish the seed for the crop raised during the five years, of which he was to receive two thirds and the lessor one third.

From Umatilla: GILBERT W. PHELPS, Judge.

In Banc.    Statement by Mr. Justice Bean.

This is a suit by N. K. Bott against Harriet Campbell, Charles Argyle Campbell, Grace Emaline Campbell, Harriet Fitzgerald Campbell and Annie M. Campbell, in which suit the plaintiff seeks to reform a written contract. From a decree in his favor the defendants appeal.

On September 19, 1911, Charles H. Campbell was the owner of 1,120 acres of wheat land in Umatilla County, about 1,000 of which were in cultivation, approximately 500 then in summer-fallow, and about 500 in stubble, from which a crop had been taken in 1911. Plaintiff, N. K. Bott, a young man, purchased of Mr. Campbell the farming outfit, consisting of horses and mules, machinery and implements, paid him $5 an acre for the work done in summer-fallowing the 500 acres during the season of 1911, aggregating about $8,600, and on the date first mentioned leased the land for a term of five years and until September 19, 1916. In order to pay for the outfit and summer-fallow plaintiff obtained a loan from his father, J. K. Bott. After there had been some negotiations between plaintiff and Mr. Campbell, and a few days before the transactions were completed, Mr. J. K. Bott, in the interest of his son, went with him to the premises of Mr. Campbell. They were accompanied by Mr. A. L. Grover, a neighbor for whom plaintiff had been working for a few years. Charles A. Campbell, a son of the lessor, was about the place at the time, and his mother was in the house. Mr. J. K. Bott secured some reduction in the price of the personal property, and, as he and Grover state, the terms of the lease were talked over in their presence. Plaintiff asserts that the conditions of the lease as agreed upon were to the effect that plaintiff should cultivate, furnish seed, plant and

raise crops on one half of the wheat land and summer-fallow and cultivate the other half each year, alternating the same, and pay as rental one third of each crop delivered in the sack at the warehouse, and that during the last season, that of 1916, plaintiff should plow or summer-fallow and cultivate the one half of the land not then in crop for which Charles H. Campbell agreed to pay him the customary or going price. Plaintiff further states that on the day the lease was executed, Charles H. Campbell, then a resident of Walla Walla, Washington, and Mr. N. K. Bott, of Helix, Oregon, met in Pendleton; that they went to the office of Mr. Leffingwell, a real estate and insurance man, for the purpose of having the lease drawn, and informed him of the agreement, and particularly that at the expiration of the lease, if the place was left in summer-fallow, Bott was to be paid the customary price of the country for such work; that nothing was said about seed for the crop to be sown in the fall of 1916. The lease, which is in evidence, was written in duplicate by Mr. Leffingwell, read to the parties, and signed by them. Plaintiff deposited his copy in the First National Bank across the street, and Mr. Campbell took his copy with him. Upon being informed that the lease was executed, Mr. J. K. Bott gave Mr. Campbell a check for his son in payment of the personal property and the summer-fallow then on the land. No other memorandum of the farming outfit or payment for the summer-fallow appears to have been made, these matters not being mentioned in the lease. The evidence shows that plaintiff took possession of the personal property and farmed the land as agreed until about the first of the year, 1916, when a dispute arose in regard to the summer-fallowing of the land during the season of 1916 and the furnishing

of seed for a crop to be harvested in 1917 without pay therefor. Plaintiff then examined his lease for the first time since it had been read to him. Charles H. Campbell died in December, 1911. Mr. Leffingwell is now deceased.

In his complaint plaintiff sets forth the agreement as he claims it was made. He further alleges that the scrivener who drew the lease, a copy of which is attached to the complaint, "was told of all of the provisions of said agreement by both parties thereto, but" failed and neglected to correctly specify the full terms thereof, in this, that he failed to insert in the body of the instrument that the plaintiff should receive the reasonable market price for the work performed by him in summer-fallowing the half of the tillable lands during the year 1916, and did inadvertently and erroneously provide in the lease that the plaintiff was to furnish all necessary seed to sow the summer-fallow; that it was thoroughly and mutually agreed between the parties to the lease that plaintiff was to receive such pay for such work, and that he was not to furnish the seed to sow the summer-fallow during the fall of 1916; that the lease was hurriedly read by the scrivener, and neither plaintiff nor Charles H. Campbell noticed that the written lease contained any provisions to the contrary, "but both believed and understood said written lease contained the provisions so agreed upon." Plaintiff alleges that whatever provisions contained therein are contrary to the understanding and agreement so had between him and Charles H. Campbell were inserted therein erroneously, inadvertently, without the knowledge, and contrary to the understanding, of both parties, and contrary to the real agreement of lease and rental made and entered into between them "and without fault or negligence

on the part of either''; that the defendants are contending for a performance according to a literal construction of the exact language used by the scrivener in the lease.

Defendants, who are the heirs of Charles H. Campbell, deceased, deny the allegations of the complaint as to any mistake in writing the agreement.

AFFIRMED.

For appellants there was a brief with oral arguments by *Mr. Alger Fee* and *Mr. James A. Fee.*

For respondent there was a brief over the names of *Mr. Will M. Peterson* and *Messrs. Raley & Raley,* with oral arguments by *Mr. Peterson* and *Mr. J. Roy Raley.*

MR. JUSTICE BEAN delivered the opinion of the court.

1. From a careful reading of the evidence we find, as did the learned trial judge, that the agreement was made between plaintiff and Charles H. Campbell as alleged in plaintiff's complaint; that it was mutually agreed between the parties to the lease that plaintiff should receive a reasonable compensation for the work to be done by him in summer-fallowing that portion of the land which was not in crop during the season of 1916, and that it was not agreed nor understood that he should furnish seed to sow the summer-fallow during the fall of 1916 for the 1917 crop; that by mistake of the scrivener the writing failed to express the contract as made. The terms of the lease were stated to the plaintiff by Mr. Charles H. Campbell when the former was first at his place for the purpose of renting the land and purchasing the personal property. Defendant Charles A. Campbell testified to the effect that he was present during the preliminary negotia-

.tions on the front porch and also at the time of the second conversation, when Mr. J. K. Bott and Mr. Grover were there. As to what was said at the second meeting about the lease, he stated:

"The lease was to be made for five years and they were to give one third of the crop in the warehouse; they agreed to the whole substance of it."  :

To the question: "Was there anything said at that time about the terms of it that you recall?" he answered, "No, sir." He further stated the substance of the conversation about the equipment, and that that was the extent of the conversation there that day; that he was present all the time when Bott was there with his father. On cross-examination he testified in part that a few days before the lease was drawn this conversation was held—

"around the place, part of it in the house and part of it around the machine-shed and barn; they walked around.

"Q. Was there anything said about the general terms of the lease of the farming lands?

"A. No, sir.

"Q. Where was that discussed about the farming lands?

"A. About the terms of the lease, it was discussed a few days before that when Mr. N. K. Bott came down to see about renting the place.

"Q. But on that date what was discussed, or was anything said about the lease that day?

"A. There was nothing said about the lease at all that day.

"Q. Was anything said at all about the farming lands that day when Mr. Grover was there?

"A. No, sir; it was all about the outfit that was talked about that day."

The witness stated that if the summer-fallow was mentioned it was somewhere else; that about a week

before this time, when N. K. Bott was first there, the conditions of the lease (as above stated) were mentioned, and "there was nothing said about the summer-fallow; he bought the summer-fallow at $5 an acre and that is all there was about it"; that the summer-fallow was on a list with the outfit, 500 acres at $5 an acre. He continued:

"My father said to him he should leave the ground plowed the last year; that is all there was said. * *

"Q. Was there anything said about whether he was to get any pay for it or not?

"A. No, sir; there was nothing said either way. * * He [plaintiff] said he would plow the land the last year of the lease, the last year he was there.

"Q. Did that mean all the land, he was to plow all the land the last year, or did he say what he meant?

"A. It was not said but it was taken for granted that he would plow the part which was in stubble. * *

"Q. Wasn't it also taken for granted, if there was any summer-fallow left there, a reasonable price was to be paid for it? (Objection by counsel and ruling by the court.)

"Q. Do you know whether that was taken for granted or not from the course of the conversation you heard there?

"A. I thought it was."

Mrs. Harriet Campbell, widow of the lessor, testified to the conversation on the front porch the first time that plaintiff came there to rent the place, and stated: "They didn't come to any definite conclusion the first time about all of the details, but it was afterward," that she did not hear all the conversation between the parties at the second meeting, but that a definite bargain was made the second time the parties were there. The only effect of the evidence of Mrs. Campbell and Charles A. Campbell is that they did not hear the agreement as to the extra work. Mr. C. A.

Campbell thinks he was present all the time during the two conversations. N. K. Bott is corroborated by the positive testimony of J. K. Bott, his father, and of A. L. Grover, a disinterested witness, to the effect that Mr. Charles H. Campbell stated that when he came back he wanted the summer-fallow left on the place, and that he would pay the customary price for such work. The whole proposition appears to have been accepted by plaintiff with that understanding. No one heard anything said about Bott furnishing seed for seeding the land after the lease expired. The lease was drawn by a layman who apparently was unaccustomed to such work and unfamiliar with the usual manner of raising wheat in that locality. The instrument is a novelty in that according to its stipulations:

The lessee "agrees that he will cultivate and summer fallow the said lands each year during the life of this contract, and will summer-fallow the land during the last year of said contract; the work to be done in a good and husbandlike manner, and will furnish all seed necessary to sow the same, and that prior to sowing said lands he will keep the same free and clear from weeds. Said second party agrees to cut, thrash and take care of said crop so grown on said lands, in proper season, and that he will deliver to the said first party, one third of the grain so grown at the warehouse designated by the said first party, free of all expense to the said first party, as soon as the grain is thrashed, said second party to furnish all new sacks for all the grain so grown. * * "

It was well known that no crops could be raised during the time the land was in summer-fallow; therefore the parties proceeded with that understanding. Plaintiff cultivated and raised crops upon about one half of the land, and plowed and summer-fallowed the other half each year for four years, and paid defendants their portion of the crop, which was accepted without

question. Except for the last year of the term when only one half of the land would ordinarily be in crop, the language of this part of the writing is immaterial. The evidence plainly shows that one half of the land was agreed to be summer-fallowed and one half sowed to a crop each year, and that as the lease would practically expire as to that part of the land which was in crop in 1915, during that fall or one year before plaintiff's interest in the other half would cease. Mr. Campbell promised to pay a reasonable price for summer-fallowing that portion during the season of 1916.

2. It is contended on behalf of defendants that the testimony of J. K. Bott and A. L. Grover as to the conditions of the lease stated by Mr. Campbell is incompetent to prove the actual contract; that such statements were mere negotiations leading up to the making of the agreement, which was effected when the lease was signed. However, the testimony leads us to believe that the contract was perfected at the time the parties met on the premises when J. K. Bott and A. L. Grover were there, and they talked over and agreed upon all the details. The only thing remaining was to reduce the agreement to writing. There was a meeting of the minds of the contracting parties. The error in reducing the agreement to writing occurred in the ordinary way, and without the particular fault or negligence of either party. Both appeared to understand that the written memorandum expressed the stipulations made between them.

3. Where one of the contracting parties is deceased, in order to reform a written memorandum of the stipulations executed by them, the evidence should be carefully scrutinized, and found to be convincing and to clearly show the contract as actually made by the parties, and that a mutual mistake has been made in

reducing the agreement to writing, and that the instrument does not express the contract as intended: *Lehigh Coal etc. Co.* v. *Central R. Co. of N. J.*, 41 N. J. Eq. 167 (3 Atl. 134, 137); *Hawkins* v. *Doe,* 60 Or. 437, 445 (119 Pac. 754, Ann. Cas. 1914A, 765). The testimony in the present case complies with this rule in a full measure. All agree that the writing in question is erroneous in respects other than as to the portion about which there is a controversy. It was read over to the parties, and no one suspects that it was not correctly read; therefore no negligence can be predicated upon the fact that the plaintiff did not read it himself until about four years afterward.

The language of the instrument is so general that it is not at all strange that it was not understood by the parties. It shows that there was a special agreement in regard to the summer-fallowing to be done during the season of 1916. This was quite a large amount of work, a season's plowing of 500 acres, and the writing, in any event, should have specified at whose expense it was to be done, instead of being left out. As we understand the document, instead of the oral evidence contradicting its terms, it merely supplies a portion of the agreement which was not reduced to writing. The imperfection of the instrument, a part of which is admitted, lessens its evidentiary force and value. The writing is not the contract. It is merely evidence thereof.

It is inconceivable that N. K. Bott, a young man just starting on a business venture of five years' duration, should assent to doing extra plowing and cultivating to the amount of about $2,500 when he was to get no part of the crop prepared for, without talking the matter over with his prospective landlord. It was perfectly in keeping with the usual business methods that

the matter should be discussed, just as Mr. J. K. Bott
and A. L. Grover testify was done. They were both fa-
miliar with such farming arrangements, and Mr. Bott,
was, no doubt, interested for his son; in fact acted in
his behalf in making a part of the deal. The integrity
of neither of these two men is questioned. We have
no doubt that the contract was made in regard to the
compensation for the summer-fallow in 1916, as as-
serted by plaintiff and these two witnesses, when the
evidence is considered in the light of all the attending
circumstances, and that by mistake of the scrivener
the written lease failed to record the agreement as
made, or as the parties thereto intended. In 2 Pom.
Eq. Juris., § 859, the general rule is announced as fol-
lows:

"It is therefore settled that in the suits, whenever
permitted, to reform a written instrument on the
ground of a mutual mistake, parol evidence is always,
admissible to establish the fact of the mistake, and in
what it consisted, and to show how the writing should
be corrected in order to conform to the agreement
which the parties actually made. * * The court may
grant relief upon the strength of the verbal evidence
alone. * * The authorities all require that the parol
evidence of the mistake and of the alleged modifica-
tion must be most clear and convincing, in the language
of some judges, 'the strongest possible,' or else the
mistake must be admitted by the opposite party; the
resulting proof must be established beyond a reason-
able doubt. Courts of equity do not grant the high
remedy of reformation upon a probability, nor even
upon a mere preponderance of evidence, but only upon
a certainty of the error."

In *Smith* v. *Interior Warehouse Co.*, 51 Or. 578, at
page 581 of the opinion (94 Pac. 508, 509, 95 Pac. 499),
it is stated:

"There can be no dispute as to the law that equity
will entertain jurisdiction to reform a contract on the

ground of mistake; but, to entitle plaintiff to such relief, the mistake must be shown by satisfactory proof, and that it was mutual: *Stein* v. *Phillips,* 47 Or. 545 (84 Pac. 793)."

When a mistake or imperfection of a written instrument is put in issue by the pleadings, oral evidence of the agreement as actually made is permissible under Section 713, L. O. L., as between the parties or their representatives or successors in interest.

Let us contract the clause in regard to the work during the last year with the following specifications found in the latter part of the lease:

"The party of the first part agrees to furnish at the town of Helix all posts and wire necessary to keep the fences on the premises in a good state of repair; it being understood that the party of the second part is to furnish the labor without expense to the party of the first part."

It is easy to conjecture the reason for such an exact stipulation in relation to an outlay of a very few dollars and a little labor in repairing the fences each year when a matter of plowing and cultivation at an expense of some $2,500 for a crop to be raised after the lease would expire is couched in a dozen words. The clause in regard to fencing is very common, and it was handy for an amateur to obtain a form for the same, while it was necessary to write the agreement in regard to the work of summer-fallowing as an original, without the assistance of a form.

4. While there is a chance for controversy as to the seed for sowing the land during the fall of 1916, from an examination of the agreement, the substance of which, in so far as it relates to that matter, is set out above, we very much doubt if the stipulation should be so construed as to require the lessee to furnish seed after the expiration of the lease. Taking the docu-

ment by its four corners, it is clear that Bott was to have possession of the land for five years and raise five crops thereon, furnishing seed to sow the same. Looking at the second paragraph quoted above, we find that he agrees to care for and harvest the grain so grown and deliver to the lessor one third thereof. There is just as much room for contention that Bott should have a portion of the crop sown in 1916, and that the lessor should have only one third thereof, as that the lessee should be required to furnish grain to seed the land after his term had expired, for a crop to be raised in 1917 in which he was not to share. It seems to us, rather, that the lease terminates on September 19, 1916, and that the clause, "will furnish all seed necessary to sow the same," means that the lessee should furnish necessary seed for sowing the lands each year during the five years. The evidence clearly shows that such was the agreement. The finding of the trial court amounts to the same thing as the construction we have given the written memorial.

It follows that the decree of the lower court should be affirmed; and it is so ordered.        AFFIRMED.